IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Robert Strougo, on Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> Lannett Company, Inc., et al. <br><br><br> Defendants. | Case No. 2:18-cv-03635-MAK |

**AMENDED CLASS ACTION COMPLAINT
FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs Soe Wong and Michale Hoeltzel ("Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, allege in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Lannett Company, Inc. ("Lannett" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of the defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews with various former Lannett employees; and (e) information readily obtainable on the Internet.

Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired Lannett securities between February 8, 2018 and August 17, 2018, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Lannett develops, manufactures, packages, markets, and distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas. Lannett derives the majority of its revenue from the sale of drugs that are bioequivalent to certain patented drugs once their patent expires.

3.     Lannett's primary supplier of bioequivalent drugs is Jerome Stevens Pharmaceuticals ("JSP"). Under the terms of a distribution agreement, Lannett receives drugs from JSP and sells them to the market. This distribution agreement—referred to herein as the JSP Agreement—was initially negotiated by Lannett's former CEO, Arthur Bedrosian ("Bedrosian"), in March 2004. The JSP Agreement greatly favored Lannett by limiting JSP to increasing costs by just 3% annually, while allowing Lannett unfettered retail price increases to as much as the market could handle. The JSP Agreement had no profit-sharing provisions, but did provide JSP with 4 million shares of Lannett common stock initially, and an additional 1.5 million shares at renewals.

4.     The JSP Agreement was critical to Lannett's success as purchases of finished goods from JSP accounted for 37% of Lannett's inventory purchases in fiscal year 2018, 36% in fiscal year 2017 and 52% in fiscal year 2016. JSP supplied one of Lannett's most successful drugs, Levothyroxine Sodium Tablets USP, whose net sales totaled $253.1 million, $187.0 million and $190.4 million in fiscal year 2018, 2017 and 2016, respectively, or 37%, 30% and 35% of total net sales, respectively. Another of Lannett's key products, Digoxin Tablets, was also supplied by JSP. Net sales of Digoxin tablets totaled $4.9 million and $9.5 million in fiscal years 2018 and 2017, respectively.  Levothyroxine Sodium and Digoxin collectively accounted for 37% and 29% of Lannett's total net sales in fiscal year 2018 and 2017, respectively.

5.      After almost twelve years of helping Lannett navigate the precarious and critical relationship with JSP, including extending the initial contract in August 2013, Bedrosian was pushed out, and on September 25, 2017, Lannett announced that Bedrosian would step down as soon as a new CEO was appointed. On December 21, 2017, Lannett announced that Defendant Timothy Crew would succeed Bedrosian, effective January 2, 2018.

6.      Lannett, immediately recognizing that Bedrosian's departure might jeopardize the fragile relationship with JSP, stated in the February 8, 2018 Quarterly Earnings Call that Bedrosian would be remaining on in a "strategic advisory role of the company" and "will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP." This was not enough, especially given the overhaul in core management that the new CEO, Crew performed in an effort to cut costs and onboard Crew's cronies from previous pharmaceutical positions. The loss of Bedrosian's full leadership combined with Crew's new team and aggressive cost-cutting measures spelled the end for the JSP relationship.

7.      As Lannett's relationship with JSP became more strained, JSP made moves to form strategic alliances with other drug distributors, yet despite these circumstances which made non-renewal of the agreement more and more imminent, Defendants continued to portray that it was business as usual for Lannett, and omitted to disclose that Lannett was on the precipice of losing the JSP Agreement .

8.      Yet despite the increased unlikelihood of renewal of the JSP Agreement, on February 8, 2018, during a Quarterly Earnings Call, Crew stated, "We obviously have a very long mutually beneficial relationship with the JSP, they are a significant shareholder and would be happy to add that to their share base. I'm optimistic, because of the number of things we have

going on between the two companies that there is a big need for us to continue to partner as we have in the past."

9.     Throughout the Class Period, Defendants continued to make similar materially false and misleading statements and omissions regarding the Company's business, operations, and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) JSP would not be renewing the distribution agreement with Lannett; and (ii) as a result of the foregoing, Lannett's public statements were materially false and misleading at all relevant times.

10.     On August 20, 2018, prior to market opening, Lannett issued the following press release:

> ***Lannett Company, Inc, today said that its distribution agreement with Jerome Stevens Pharmaceuticals (JSP), which expires on March 23, 2019, will not be renewed. "***
>
> ***The Steinlauf family advised us this past Friday evening that they will not renew our agreement to distribute three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP, Digoxin Tablets USP and Levothyroxine Sodium Tablets USP, upon its expiration in March 2019,***" said Tim Crew, chief executive officer of Lannett. "The family has assured us of a continuous supply of the products through March of next year. These products remain valuable assets for us and are expected to significantly contribute to our financial performance in fiscal 2019. "While we are disappointed, and intend to redouble our continuing efforts to explore options for addressing our capital structure, we have been preparing for this contingency, knowing that this outcome was a possibility."

11.     During the Class Period, Lannett's common stock price closed as high as $18.05 on February 8, 2018. Upon the news of the non-renewal, Lannett's share price plummeted $8.15, or 60.3%, to close at $5.35 on August 20, 2018.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs Soe Wong and Michale Hoeltzel, and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Lead Plaintiffs Soe Wong and Michale Hoeltzel purchased Lannett securities at artificially inflated prices during the Class Period and was damaged upon the revelation of defendants' fraud. Lead Plaintiffs filed their certification evidencing their transactions previously with the Court in connection with their motion for appointment as Lead Plaintiffs. Lead Plaintiffs' certifications are incorporated herein by reference.

18.     Defendant Lannett is a Delaware corporation with its principal executive offices located at 9000 State Road, Philadelphia, Pennsylvania 19136. Lannett's common stock trades on the NYSE under the ticker symbol "LCI".

19. Defendant Timothy C. Crew ("Crew") has served as the Company's Chief Executive Officer, since January 2018.

20. Defendant Marty P. Galvan ("Galvan") served as the Company's President of Finance, Chief Financial Officer, and Treasurer at all relevant times.

21. Defendants Crew and Galvan are sometimes referred to herein as the "Individual Defendants."

22. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Lannett's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and commissions pleaded herein.

23. Lannett is liable for the acts of Crew, Galvan, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

24. The scienter of Crew, Galvan, and other employees and agents of the Company are similarly imputed to Lannett under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

**A.    Background**

25.    Lannett develops, manufactures, packages, markets, and distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas. Lannett also produces, through its subsidiary, Cody Laboratories, Inc., active pharmaceutical ingredients. Lannett derives the majority of its revenue from the sale of drugs that are bioequivalent to certain patented drugs once their patent expires.

26.    Many of Lannett's products are manufactured by others – primarily JSP – and distributed by the Company. In fact, Lannett's contract with JSP was one of the most critical, if not the most critical, contract that Lannett had. Purchases of finished goods inventory from JSP accounted for 37%, 36% and 52% of the Company's inventory purchases in fiscal years 2018, 2017 and 2016, respectively.  Lannett reported that the value of products from the contract with JSP was $253 million in fiscal 2018, including $245.9 million from levothyroxine sodium tablets, up from the $174 million in total net revenue reported for levothyroxine sodium tablets in fiscal 2017. Finished goods from JSP accounted for 37% of Lannett's inventory purchases in fiscal year 2018, 36% in fiscal year 2017 and 52% in fiscal year 2016.

27.    Levothyroxine Sodium and Digoxin, both supplied by JSP, collectively accounted for 29% of Lannett's total net sales in fiscal year 2017. Lannett's top-seller is Levothyroxine and Lannett's gross margin on it is 60%. Both Levothyroxine and Digoxin have a narrow therapeutic index, which means that under-dosing is ineffective, while overdosing can be lethal. This leads consumers to be loyal to manufacturers once they find a dosage and formulation that works. This customer loyalty, in turn, makes demand more stable. Through JSP, Lannett enjoyed up to a 14% market share of Digoxin throughout the duration of the JSP agreement, while enjoying a 10%

market share of Levothyroxine. Lannett's Levothyroxine net sales totaled $253.1 million, $187.0 million and $190.4 million in fiscal year 2018, 2017 and 2016, respectively, or 37%, 30% and 35% of total net sales, respectively, while net sales of Digoxin, also supplied by JSP, totaled $4.9 million and $9.5 million in fiscal years 2018 and 2017, respectively. Levothyroxine and Digoxin collectively accounted for 37% and 29% of Lannett's total net sales in fiscal year 2018 and 2017, respectively. During the Class Period, purchases of finished goods for JSP accounted for more than one-third of Lannett's inventory purchases.

28.     The JSP Agreement, first entered into on March 23, 2004, was negotiated by former CEO Arthur Bedrosian, whereby JSP would make the formulation and stamp out the pill and Lannett would just distribute the product. The terms of the agreement were grossly in favor of Lannett as it allowed Lannett to greatly increase prices on Levothyroxine, while capping JSP at raising prices only 3% per year. During the contract, Bedrosian increased margins on Levothyroxine at 200% clips, thus generating massive margin for Lannett while capping JSP's benefit. As part of the agreement, Lannett issued JSP 4 million shares of Lannett, which equated to 17% of the outstanding shares at the time.

29.     Bedrosian had a close relationship with JSP, and despite the lop-sided terms of the JSP Agreement, Bedrosian was able to negotiation an extension of the initial contract. On August 19, 2013, the JSP Agreement was amended to continue for a five-year term with an expiration date of March 23, 2019. The extension of the initial contract allowed Lannett to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP; Digoxin Tablets USP; and Levothyroxine Sodium Tablets USP. As part of the Amendment, JSP was issued an additional 1.5 million shares, triggering Lannett to record a $20.1 million expense in cost of sales, which represented the fair

value of the shares on August 19, 2013. If the parties were to agree to a second five-year extension from March 23, 2019 to March 23, 2024, Lannett was required to issue to JSP or its designees an additional 1.5 million shares of the Company's common stock.  Maintaining Lannett's share price was important to the Company for a number of traditional reasons, but more importantly, because a high share price would make renewing the Agreement more attractive to JSP.

30.     During the class period, the only risk warning in Lannett's periodic SEC filings related to JSP stated, "During the renewal term of the JSP Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. There is no guarantee that the Company will be able to meet the minimum purchase requirements.  If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Distribution Agreement." The risk factors made no mention of any risks related to JSP's failure to provide products nor of JSP failing to renew the contract.

31.     Bedrosian was eager to lead Lannett to continued growth and success, thus on November 27, 2015, Lannett announced the acquisition of Kremers Urban Pharmaceuticals Inc. This acquisition was very costly. The acquisition was financed by a combination of proceeds of a recently completed $1.285 billion debt financing and cash on hand. Lannett entered into a $1.035 billion secured credit facility and issued $250 million of senior unsecured notes, the proceeds of which were used to fund the acquisition and related transaction costs. The secured credit facility comprised a $910 million term loan facility and a $125 million revolving credit facility.

32.     The Kremers Urban acquisition did not go as well as Bedrosian had planned, the debt from the acquisition weighed heavily on Lannett. Between the time of Lannett's deal to buy Kremers Urban until the announcement, Kremers Urban notified Lannet that "a key customer has

taken steps to transition its purchases of certain product lines." Those product lines represented about $87 million of Kremers' $463 million in annual revenues for 2014. In February 2016, Lannett announced that it would cut 20% of the workforce to streamline operations, reduce costs, and adapt to the acquisition of Kremers Urban. The stock price fell following this announcement. The workforce cuts were not enough, and Bedrosian soon began increasing Lannett's drug prices precipitously. Then, in October 2016, Lannett's stock price plummeted further when the FDA announced its plan to withdraw approval of its generic treatment for attention deficit hyperactivity disorder. Lannett had acquired methylphenidate hydrochloride product, a bioequivalent of Concerta, during the purchase of Kremers Urban.

33.     Lannett's board had had enough of Bedrosian and the burdensome debt incurred during his leadership. On September 25, 2017, Lannett announced that Bedrosian would step down as soon as a new CEO was appointed. Thus after almost twelve years of carefully helping Lannett navigate the precarious and critical relationship with JSP, including extending the initial contract in August 2013, Bedrosian was pushed out. On December 21, 2017 Lannett announced that Timothy Crew would succeed Bedrosian, effective January 2, 2018.

34.     Lannett, immediately recognizing that Bedrosian's departure might jeopardize the fragile relationship with JSP, stated in the February 8, 2018 Quarterly Earnings Call that Bedrosian would be remaining on in a "strategic advisory role of the company" and "will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP." This was not enough, especially given the overhaul in core management that the new CEO, Crew performed in an effort to cut costs and onboard Crew's cronies from previous pharmaceutical positions. The loss of Bedrosian's full leadership combined with Crew's new team and aggressive cost-cutting measures spelled the end for the JSP relationship.

35.     Bedrosian also realized that the JSP Agreement was doomed without his leadership, and thus sold approximately $2.5 million of his shares of Lannett in November 2017.

36.     A number of former Lannett employees, including a director of Procurement, a SAP analyst, two Regional Sales Directors, and a National Sales Director, reaffirmed the importance of Bedrosian to Lannett's relationship with JSP. These employees were not surprised when the Agreement was not renewed. One noted that "the relationship with JSP walked away when Arthur Bedrosian was asked to leave." Another employee, the National Sales Director, even noted that he thought that Bedrosian and Bedrosian's 'right hand man,' Kevin Smith, may have known the relationship with JSP was going to end and sold a lot of stock before the news came out in anticipation of the stock drop that would come when the news of JSP's non-extension was revealed to the public.

37.     As early as July 2014, JSP formed a partnership with Gemini Labs for Levothyroxine distribution. Gemini Labs distributes multiple forms of Levothyroxine. In May 2018, Amneal Pharmaceuticals acquired Gemini Laboratories.

**B.     Materially False and Misleading Statements Issued During the Class Period**

*February 8, 2018 – Quarterly Report*

38.     On February 8, 2018, Lannett filed its Form 10-Q for the quarter ended December 31, 2017 (the "Q2 2018 10-Q"). For the quarter, the Company reported Net Sales of $184.3 million, and Gross profit of $87.5 million. The Company also reported that "[p]urchases of finished goods inventory from JSP accounted for approximately 39% of the Company's inventory purchases during the three months ended December 31, 2017 and 2016."

39.     With respect to the JSP Agreement, the Q2 2018 10-Q merely stated, in relevant part:

During the renewal term of the JSP Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. ***There is no guarantee that the Company will be able to meet the minimum purchase requirement for Fiscal 2018 and in the future. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Agreement.***

40.     The Q2 2018 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Crew and Galvan, stating that the Q2 2018 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

41.     The statements referenced in paragraphs 39-40 were materially false and misleading because Defendants failed to disclose the imminent risk or any risk of the non-renewal of the JSP Agreement and instead created the false impression that the relationship would continue. The only risk that Defendants disclosed with regards to JSP is that Lannett could fail to meet the minimum purchase requirements, not that JSP could or would fail to renew the contract or cease supplying Lannett. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that Lannett faced a substantial risk of the loss of the JSP Agreement.

### *February 8, 2018 – Quarterly Earnings Call*

42.     On the Company's earnings call with analysts for the second quarter of 2018, Defendant Crew discussed the Company's relationship with JSP, stating:

I'm pleased to say that Arthur Bedrosian our former CEO has agreed to a strategic advisory role of the company. He will be focused on transitioning and ***strengthening our relationships with our key alliance partners of JSP*** and HTC among others. I'm happy to have him on board and look forward to continue to work together.

43. On that same earnings call, an analyst asked Defendant Crew: "where do you stand on locking down an arrangement with JSP to secure your most important for now product over the longer term?" Defendant Crew responded:

Let me start with the JSP licensure first. Obviously it's a critical important relation we look forward to expanding that relationship overtime. ***We obviously have a very long mutually beneficial relationship with the JSP, they are a significant shareholder and would be happy to add that to their share base. I'm optimistic, because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past.***

Please note as we've announced earlier and I noted in my remarks, we have retained Arthur to facilitate and guide exactly such transactions and conversations and transitions and look forward to doing that with them. The timeline of these sorts of transactions have their own pacing. But ***it's clearly a priority and we're optimistic that well come to a good position in a relatively not-too-distant future.***

44. In response to a second question concerning the Company's relationship with JSP, Defendant Crew responded, in relevant part:

Again on — there's two parties in the negotiation, we're going to have that conversation with them in terms of things that matter to them and things that matter to us. ***I want to stress that we- it's a long-term relationship with a lot of moving parts, shareholder relationships, share repurchase opportunities which I think is disclosed in all of our documents and again working with Arthur to find the way that makes sense for them and us in the way we move forward, as quickly as possible.***

So there's a renewal component as it relates to the current contract, but we would sit down with them and find out what are the things that they most care about in order to make the productive conversation, so I won't speculate here on those moving parts but just ***please trust that that it is an incredibly high priority for us and that we are working with all the folks in the company, before I came and while I am here, to make sure that comes to a great outcome for both parties.***

45. The statements above in paragraphs 42-44 were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the JSP Agreement and instead created the false impression that the relationship would continue. Defendant Crew reinforced the notion that former CEO Bedrosian will be "strengthening our relationships with

our key alliance partners" as well as emphasized that the Lannett-JSP relationship was a "very long mutually beneficial relationship" and that "because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past." These statements failed to address the substantial risk that the relationship would not continue and instead implied that the relationship would continue.

46.      Additionally, Defendant Crew stated that JSP is a "significant shareholder" despite the fact that JSP was not, even though JSP had been issued 5.5 million shares since 2004, which equated to almost 15% of the 38 million shares of currently issued Lannett stock. Defendant Crew misled the public to believe that JSP had a vested interest in the Company, when in fact, JSP had never been listed in any SEC filing as a beneficial owner. Defendant Crew painted a picture of a continued partnership between Lannett and JSP, when in reality JSP was not as vested as Defendant Crew portrayed, had a practice of liquidating the majority of its shares in Lannett as soon as it received them, and had already begun forming a strategic alliance with another distributor of levothyroxine.

*May 7, 2018 – Quarterly Earnings Call*

47.      On the Company's earnings call with analysts for the third quarter of 2018, Defendant Crew discussed the Company's relationship with JSP. Deutsche Bank AG Analyst Gregory Gilbert asked Defendant Crew, "Just on your JSP situation, sort of the elephant in the room.... Is there anything you could tell us about under what circumstances you would not proceed with extending that collaboration in some way? Just want to understand whether you're sounding confident about getting something done versus something that looks a particular way. So anything you're willing to say on that would be really helpful." Defendant Crew responded:

> Yeah**. It's a big beautiful elephant. We embrace that as an organization. Look, I've met with the team. We speak with them regularly.** They're terrific folks.

***They're savvy managers. We have a great dialog on an ongoing basis, all the various moving parts and I believe they are very supportive of the initiatives that we've been talking about.*** I don't want to put the cart in front of the horse, elephant aside, but ***I'm optimistic that we'll get a chance to renew this agreement when it's right for both parties.*** There is clearly nothing more important to our business than doing so and we'll continue to be focused on doing just that.

48.     The statements above in paragraph 47 were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the JSP Agreement and instead created the false impression that the partnership would continue. When Analyst Gilbert directly asks about the future of the Lannett's relationship with JSP, Defendant Crew promoted the positive progress Lannett had made and how it was well-received by partners. Defendant Crew hid the fact that the relationship with JSP was uncertain, particularly given that JSP had formed a relationship with the well-established levothyroxine distributor Gemini as well as liquidating the majority of the 5.5 million shares that JSP had been issued since 2004.

### *May 8, 2018 – Quarterly Report*

49.     On May 8, 2018, Lannett filed its Form 10-Q for the quarter ended March 31, 2018 (the "Q3 2018 10-Q"). For the quarter, the Company reported Net Sales of $174.4 million, and Gross profit of $67.1 million. The Company also reported that "[p]urchases of finished goods inventory from JSP accounted for approximately 37% and 33% of the Company's inventory purchases during the three months ended March 31, 2018 and 2017, respectively."

50.     With respect to the JSP Agreement, the Q3 2018 10-Q again merely stated, in relevant part:

> During the renewal term of the [JSP Agreement], the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. There is no guarantee that the Company will be able to meet the minimum purchase requirements. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Agreement.

51.     The Q3 2018 10-Q contained signed certifications pursuant to SOX by Defendants Crew and Galvan, stating that the Q3 2018 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

52.     The statements referenced in paragraphs 50-51 were materially false and misleading because Defendants fail to disclose the imminent risk or any risk of the non-renewal of the JSP Agreement. The only risk that Defendants disclose with regards to JSP is that Lannett may fail to meet the minimum purchase requirements, not that JSP may fail to renew the contract or discontinue supplying Lannett.

*May 9, 2018 – Deutsche Bank Health Care Conference Call*

53.     On May 9, 2018, Defendants participated in the Deutsche Bank Health Care Conference. At the Conference, Defendant Crew addressed Lannett's key partnership with JSP:

> Looking a bit beyond that, we obviously want to continue to drive our internal pipeline, whether it's externally or internally sourced. Internally, we'll focus again on some of the pain management opportunities and solutions where we have some distinctive capabilities. And on the external side, be more thoughtful about technologies and specialized capabilities to bring into our portfolio.
>
> And last but not least, and as you've seen if you've been tracking the company of late, we do want to continue to leverage our mid-market position where we see the generic as a big blue ocean of opportunity that is providing many opportunities first to our business, and position ourself as a partner of choice for these companies.
>
> ***A number of other suppliers, you see them on the right side of the slide have -- they're believing in that positioning and bringing their products to us. Everything from long-standing partnerships with Jerome Stevens, the basis of our levothyroxine product as well as new partners from Aralez to Sciecure to Cerovene and Dexcel and others. And we look forward to their contributions to our revenues as we move forward.***

54.     At the conference, Deutsche Bank AG Analyst Gregory Gilbert again asked Defendant Crew about the status of Lannett's relationship with JSP, stating. "Just looking at your last slide there, you spent a fair amount of time on levo. Missing from that slide is your prediction of what will actually happen with the durability of the product for you and your relationship. So here's your opportunity to clarify what is going to happen." Defendant Crew replied,

> So I think I alluded in every company has its concerns and issues. What Gregg is referring to here is our contract with this long-term partnership JSP**. It does have a technical expiration date of March of next year.** And I think some of the concerns for our company and the valuations you see is about the persistency of that contract. While again, I'm very careful not to indicate what another party will do, our partners at Jerome Stevens are proud, bright and capable businessmen, and they don't need me to speak for them relative to their exact intentions. And I wouldn't presume to do so.
>
> ***However, I would note that they're one of our largest shareholdings with the company and they are businessmen that are closely watching the sort of changes we're making to the business, and I believe applaud it. And as a result, I'm confident when their time is ready, we'll get to that renewal.***

55.     The statements above in paragraphs 53-54 were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the distribution contract with JSP and instead perpetuated the false impression that the relationship would continue. Defendant Crew stated, that the JSP Agreement had "a technical expiration date of March of next year" which implied that the functional expiration would be something different, presumably beyond the "technical expiration" or never to occur at all. Additionally, Defendant Crew noted that JSP was "one of [Lannett's] largest shareholdings," yet despite being issued 5.5 million shares since 2004, which equated to almost 15% of the 38 million shares of currently issued Lannett stock, was not even a beneficial holder of record. Defendant Crew misled the public to believe that JSP had a vested interest in the Company, when in fact, JSP was not.

**C.      Lannett Reveals the Truth and Investors Sustain Significant Damages**

56.     On August 20, 2018, prior to market opening, Lannett issued the following press release:

> Lannett Company, Inc, today said that its distribution agreement with Jerome Stevens Pharmaceuticals (JSP), which expires on March 23, 2019, will not be renewed. "
>
> The Steinlauf family advised us this past Friday evening that they will not renew our agreement to distribute three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP, Digoxin Tablets USP and Levothyroxine Sodium Tablets USP, upon its expiration in March 2019," said Tim Crew, chief executive officer of Lannett. "The family has assured us of a continuous supply of the products through March of next year. These products remain valuable assets for us and are expected to significantly contribute to our financial performance in fiscal 2019. "While we are disappointed, and intend to redouble our continuing efforts to explore options for addressing our capital structure, we have been preparing for this contingency, knowing that this outcome was a possibility. Accordingly, we have been focused on improving our already strong base commercial business of more than 100 currently marketed products. Since the beginning of this year, we added new products to our offering and expanded our customer base. We continued to streamline our operations. Specifically, we successfully launched eight new products in the first seven months of calendar 2018, which we estimate will add net sales in excess of $50 million in fiscal 2019, and in addition to our launches, we completed several transactions to add more than 25 market-ready or near-market-ready product lines to our pipeline. Importantly, we continue to make excellent progress advancing other previously approved products toward launch and plan to commence marketing a substantial number of them in the coming months and throughout fiscal 2019.
>
> "In addition, in our current fiscal year, we have already submitted four drug applications associated with two product families, implemented a restructuring plan at our Cody Laboratories subsidiary and streamlined our product distribution function.
>
> "Looking ahead, our team is actively evaluating a number of additional potential transactions to add even more products to our portfolio to grow revenues and profits, and diversify our business. We have more than 20 owned and partnered drug product applications currently pending at the FDA, and anticipate a significant number of product approvals in fiscal 2019. We also expect to expand restructuring initiatives to further reduce expenditures. Finally, we are evaluating the impact of this contract ending in March 2019 on our goodwill."

57.     On this news, Lannett's share price fell $8.15, or 60.3%, to close at $5.35 on August 20, 2018.

**D.     Defendants Acted with Scienter**

58.     Collectively, the following factual allegations strongly support an inference of scienter on the part of Defendants. Further, Defendants' actions, intentions, and deliberately reckless conduct are imputed to the Company as a matter of law. Because of their key roles in the Company, the Individual Defendants knew of the precarious state of an extended contract with JSP yet still caused Lannett to act in the manner it did and perpetuate the material misrepresentations and omissions made throughout the Class Period. Defendants acted with the requisite intent to establish liability under the Exchange Act.

59.     Lannett's principal executive and financial officers, including Defendants Crew and Galvan, possessed knowledge and control over the day-to-day dealings of Lannett as well as overall responsibility for the Company's financial reporting and internal controls over financial reporting.

60.     Defendants were aware that the JSP Agreement, which allowed JSP to increase prices only 3% per year, while allowing Lannett to increase prices without limit, grossly favored Lannett, particularly since there was no profit-sharing agreement.

61.     Defendants were aware of the precarious state of the contract with JSP, which was why they maintained former CEO Bedrosian on as an advisor, despite the fallout from the Kremers Urban buyout. The Kremers Urban buyout was valued at almost five times Lannett's then-existing revenues, while one of Kremers Urban's key generic drugs was in classification limbo at the FDA, leaving Lannett in significant debt.

62.     The Kremers Urban acquisition had not gone as well as Bedrosian had planned, not only because the debt from the acquisition weighed heavily on Lannett, but also because Kremers Urban had lost a key customer whose product lines represented about $87 million of Kremers' $463 million in annual revenues for 2014. This led Lannett to streamline operations, reduce costs, which included the February cut of 20% of the workforce, which led to a drop in the stock price following Lannett's announcement of the cuts. When, in October 2016, the FDA announced its plan to withdraw approval of its generic treatment for attention deficit hyperactivity disorder, the stock price plummeted further.

63.     But despite the fallout from the Kremers Urban acquisition, Bedrosian had helped Lannett maintain the very critical and lucrative, yet precarious relationship with JSP for almost twelve years. Many former Lannett employees attributed the success with the JSP relationship to Bedrosian and were not surprised when the JSP Agreement was not renewed after Bedrosian's departure from the CEO position. These employees included: a director of Procurement, a SAP analyst, two Regional Sales Directors, and a National Sales Director.

64.     Bedrosian also realized that the JSP Agreement was doomed without his leadership, and thus sold approximately $2.5 million of his shares of Lannett in November 2017. This sale was atypical in size and timing, given that it was his largest sale ever in dollars and percentage of overall holdings and was the first sale in nearly two years.

65.     Lannett's announcement in the February 8, 2018 Quarterly Earnings Call that Bedrosian would be remaining on in a "strategic advisory role of the company" and "will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP" shows that Lannett immediately recognized that Bedrosian's departure would jeopardize the fragile relationship with JSP. Further, given Defendant Crew's aggressive overhaul in core

management to onboard his cronies from previous pharmaceutical positions combined with the onerous cost-cutting measures, the beating Lannett's stock price had taken in recent years, and the loss of Bedrosian's full leadership, Defendants knew the JSP Agreement was at imminent risk of being canceled.

66.     Defendants knew that JSP had liquidated the majority of the shares given to JSP during earlier contracts, thus had no vested interest in Lannett's success. Additionally, Defendants knew that JSP had also established a relationship with the well-established Levothyroxine distributor Gemini.

67.     Defendants knew that, weighted down with significant debt, Lannett could not offer JSP a cash incentive as part of a renewed contract, and with another distributor of Levothyroxine already in the picture for JSP, maintaining share price was of critical importance in order to make the lop-sided deal even close to lucrative to JSP. With Lannett's current unimpressive stock price and previous hurdles and stock price drops, Defendants knew they needed to keep Lannett's stock price as high as possible during the renegotiations of the JSP Agreement.

68.     Given the importance of the JSP contract to Lannett's financials, particularly with regards to the supply of Lannett's top drugs, Levothyroxine and Digoxin, Defendants had a primary goal to ensure the JSP Agreement was extended, and to do that, Defendants could not disclose any major negative information regarding the JSP contract, which might cause Lannett's stock price to drop.

69.     To accomplish this goal, Defendants concealed the material and imminent risk that JSP may not extend the contract with Lannett. This led investors believe that Lannett's revenue and growth would continue on the same path. As a result, the price of Lannett shares

were artificially inflated, and the stock price plummeted 60.3% at the revelation of JSP's decision not to extend the contract.

**E.     Loss Causation and Economic Loss**

70.     During the Class Period, as detailed herein, Lannett and the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Lannett's securities and operated as a fraud or deceit on Class Period purchasers of Lannett securities by materially misleading the investing public. Later, when Lannett and defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Lannett's securities materially declined immediately. As a result of their purchases of Lannett's securities during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

71.     Defendants concealed material information from the public about the JSP Agreement, *i.e.*, the imminent risk that it would not be renewed. On August 20, 2018, that risk materialized when Defendants revealed that the JSP Agreement had in fact not been renewed. The market perceived this announcement to be a curative disclosure and reacted accordingly.

72.     Lannett's share price fell $8.15, or 60.3%, to close at $5.35 on August 20, 2018, and is attributable to the Company's disclosure of the truth about the non-renewal essential distribution agreement with JSP.

**F.     Presumption of Reliance; Fraud-On-The-Market**

73.     At all relevant times, the market for Lannett's common stock was an efficient market for the following reasons, among others:

(a)     Lannett's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     Lannett communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Lannett was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Lannett was reflected in and incorporated into the Company's stock price during the Class Period.

74.     As a result of the foregoing, the market for Lannett's common stock promptly digested current information regarding Lannett from all publicly available sources and reflected such information in Lannett's stock price. Under these circumstances, all purchasers of Lannett's common stock during the Class Period suffered similar injury through their purchase of Lannett's common stock at artificially inflated prices, and a presumption of reliance applies.

75.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

24

**G.      No Safe Harbor: Inapplicability of Bespeaks Caution Doctrine**

76.      The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

77.      To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

78.      Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Lannett who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

79.      Lead Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Lannett securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lannett securities were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Lannett or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of July 31, 2018, there were 38,901,532 shares of Lannett common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

81.     Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

82.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

83.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Lannett;

(c)     whether the Individual Defendants caused Lannett to issue false and misleading financial statements during the Class Period;

(d)     whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Lannett securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

84.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Against Defendants for Violations of Section 10(b) and Rule 10b-5

85.     Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

86.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Lannett securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Lannett securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

88.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Lannett securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lannett's finances and business prospects.

89.     By virtue of their positions at Lannett, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

90.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of Lannett, the Individual Defendants had knowledge of the details of Lannett's internal affairs.

91.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Lannett. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lannett's businesses, operations, future financial condition and future prospects. As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lannett securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Lannett's business and financial condition which were concealed by defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Lannett securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

92.     During the Class Period, Lannett securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Lannett securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of Lannett securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of Lannett securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

93.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94.     As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### Against the Individual Defendants for Violations of Section 20(a)

95.     Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of Lannett, and conducted and participated, directly and indirectly, in the conduct of Lannett's business affairs. Because of their senior positions, they knew the adverse non-public information about Lannett's misstatement of income and expenses and false financial statements.

97.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Lannett's financial condition and results of operations, and to correct promptly any public statements issued by Lannett which had become materially false or misleading.

98.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Lannett disseminated in the marketplace during the Class Period concerning Lannett's operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Lannett to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Lannett within the

meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lannett securities.

99.     Each of the Individual Defendants, therefore, acted as a controlling person of Lannett. By reason of their senior management positions and/or being directors of Lannett, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Lannett to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Lannett and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

100.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lannett.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as the Class representative;

B.      Requiring defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demands a trial by jury.

Dated: December 19, 2018

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#202191)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Fax (302) 295-2873

*Liaison Counsel for Lead Plaintiffs*

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Attorneys for Lead Plaintiffs Soe Wong and Michael Hoeltzel and Lead Counsel for the Class*