## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT STROUGO | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 18-3635 |
| | : | |
| LANNETT COMPANY, INC., *et al.* | : | |

## MEMORANDUM

**KEARNEY, J.**                                                     **March 13, 2019**

Lannett Company Inc. sells branded and generic pharmaceutical drugs. For most of the past fifteen years, it derived substantial revenues from drugs manufactured by Jerome Stevens Pharmaceuticals under a supply agreement. This supply relationship ends in March 2019 unless otherwise extended. Mindful of the importance of this distribution contract to its revenues, Lannett repeatedly disclosed its negotiations for an extension of this agreement to its shareholders and analysts through mid-2018. It never represents a definite amendment but expressed optimism with appropriate cautionary language. But in February 2018 and May 2018 calls with analysts and a health care conference, Lannett's Chief Executive Officer described Jerome Stevens as a significant or larger shareholder suggesting its symbiotic relationship and mutual interest in continuing the business relationship. It appears Jerome Stevens was not a significant shareholder in February or May 2018. As announced on August 20, 2018, Jerome Stevens and Lannett agreed not to extend this crucial supply agreement. Lannett's stock price dropped over sixty percent the same day. Lannett's shareholders now seek to hold Lannett and its control persons liable for misstatements and omissions in early 2018 regarding the likelihood of continuing the Jerome Stevens agreement. We find the shareholders state a claim against all Lannett Defendants arising from the Chief Executive Officer's February and May 2018 representations of Jerome Stevens'

significant or larger shareholding in Lannett when those statements were arguably not true at the time. We otherwise grant the Defendants' Motion to dismiss the remaining challenges to Lannett's representations.

## I. Fact allegations.

Lannett Company, Inc. "develops, manufactures, packages, markets, and distributes solid oral (tablets and capsules), extended release, topical, and oral solution finished dosage forms of drugs that address a wide range of therapeutic areas.[1] A significant portion of products sold by Lannett "are manufactured by others" but "distributed" by it.[2] Lannett's business success hinges on its ability to obtain a continued supply of product from suppliers. Jerome Stevens Pharmaceuticals (JSP) is Lannett's "primary supplier."[3]

In 2004, Lannett and JSP negotiated a ten-year distribution agreement ("JSP Agreement").[4] JSP agreed to supply Lannett with two of its most successful products, Levothyroxine Sodium Tablets USP and Digoxin Tablets.[5] In exchange, Lannett paid JSP with four million shares of Lannett common stock.[6] The JSP Agreement permitted Lannett to increase the retail prices of the products as it desired, but limited JSP to annual price increases of three percent for the drugs it sold to Lannett.[7] The JSP Agreement lacked "profit-sharing provisions."[8] Former Lannett Chief Executive Officer Arthur Bedrosian negotiated the 2004 agreement and held "a close relationship with JSP,"[9] which he used to "help[] Lannett maintain the very critical and lucrative, yet precarious relationship with JSP."[10]

The relationship continued as Lannett, led by then-CEO Bedrosian, negotiated with JSP a five-year extension of the parties' original ten-year agreement.[11] On August 19, 2013, the parties extended their relationship to March 23, 2019.[12] As consideration for the extension, Lannett paid JSP with 1.5 million shares of Lannett stock; the parties agreed another 1.5 million shares of

Lannett stock would follow if the parties agreed to a second five-year extension to March 23, 2024.[13]  On August 19, 2013, Lannett issued a Form 8-K announcing its "Entry into a Material Definitive Agreement."[14]  Lannett disclosed it would pay JSP with Lannett stock for both the newly-agreed-upon extension and for a potential subsequent five-year extension:

> If the parties agree to a second five year extension from March 23, 2019 to March 23, 2024, the Company is required to issue to JSP or its designees an additional one million five hundred thousand (1,500,000) shares of the Company's common stock.  Pursuant to the agreement, JSP has agreed that neither it nor its nominees will offer, sell, assign, transfer, pledge, contract to sell, or otherwise dispose of any of the Lannett shares issued upon signing of the agreement until after March 24, 2014.[15]

Lannett attached the terms of the Amendment to its Form 8-K.  The Amendment's "Term" provision stated the parties' agreed to discuss an additional extension:

> "Following the expiration of the initial ten-year term, the term of this Agreement shall be extended for five (5) years, continuing through March 23, 2019 (the "Initial Renewal Term").  *In addition, the parties agree to discuss a mutual extension, to renew this Agreement for an additional five (5) years, continuing through March 23, 2024 (the "Second Renewal Term").*  (The Initial Renewal Term and Second Renewal Term, if exercised, will be collectively referred to as the "Renewal Term").[16]

As a result of this 2013 amendment,  Lannett had cumulatively paid JSP with 5.5 million shares of Lannett stock—approximately fifteen percent "of the 38 million shares of currently issued Lannett stock."[17]  Despite this payment, JSP never appeared in an SEC filing as a beneficial owner of Lannett securities. [18]

The JSP Agreement proved valuable to Lannett.  Lannett's Levothyroxine net sales totaled $253.1 million in fiscal year 2018, $187 million in 2017, and $190.4 million in 2016.[19]  Its Digoxin net sales totaled $4.9 million in fiscal year 2018 and $9.5 million in 2017.[20]  The two drugs made up 37 percent of Lannett's total net sales in 2018 and 29 percent of its sales in 2017, though Levothyroxine drove most of Lannett's sales.[21]  Despite fostering Lannett's critical relationship

with JSP, Lannett announced Mr. Bedrosian "would step down as soon as a new CEO was appointed."[22]

Timothy C. Crew replaced Mr. Bedrosian as Lannett CEO on January 2, 2018.[23]  CEO Crew announced Lannett would retain Mr. Bedrosian in a "strategic advisory role" to "focus[] on transitioning and strengthening our relationships with our key alliance partners of JSP."[24]

### Lannett's February 8, 2018 Quarterly Report.

On February 8, 2018, Lannett filed a quarterly report with the Securities and Exchange Commission (Form 10–Q) for the quarter ending December 31, 2017.[25]  In a note labeled "Material Contracts with Suppliers," Lannett addressed the JSP Agreement as well as the possibility of an additional five-year extension:

> On August 19, 2013, the Company entered into an agreement with JSP to extend its initial contract to continue as the exclusive distributor in the United States of three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP; Digoxin Tablets USP; and Levothyroxine Sodium Tablets USP.  The amendment to the original agreement extends the initial contract, which was due to expire on March 22, 2014, for five years through March 2019.  In connection with the amendment, the Company issued a total of 1.5 million shares of the Company's common stock to JSP and JSP's designees. . . . If the parties agree to a second five year extension from March 23, 2019 to March 23, 2024, the Company is required to issue to JSP or its designees an additional 1.5 million shares of the Company's common stock.  Both Lannett and JSP have the right to terminate the contract if one of the parties does not cure a material breach of the contract within thirty (30) days of notice from the non-breaching party.  During the renewal term of the JSP Distribution Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products.  There is no guarantee that the Company will be able to meet the minimum purchase requirement for Fiscal 2018 and in the future. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Distribution Agreement.[26]

Lannett's quarterly report also incorporated by reference the risk factors from its June 30, 2017 annual report (Form 10–K),[27] where it cautioned, in bolded text, "[w]e materially rely on an uninterrupted supply of finished products from JSP for a significant amount of our sales.  If we

4

were to experience an interruption of that supply, our operating results would suffer."[28]  The annual report's risk disclosure further warned of Lannett's substantial reliance on JSP and its lack of a "second source" for those products:

> The amendment to the original agreement extended the initial contract, which was due to expire on March 22, 2014, for five years through March 23, 2019.  Both Lannett and JSP have the right to terminate the contract if one of the parties does not cure a material breach of the contract within thirty (30) days of notice from the non-breaching party.  If the supply of these products is interrupted in any way by any form of temporary or permanent business interruption to JSP, including but not limited to fire or other naturally-occurring, damaging event to their physical plant and/or equipment, condemnation of their facility, legislative or regulatory cease and desist declaration regarding their operations, FDA action or any interruption in their source of API for their products, our operating results could be materially adversely affected.  We do not have, at this time, a second source for these products.[29]

The February 8, 2018 quarterly report also included "Cautionary Statement About Forward-Looking Statements," in which Lannett warned "[f]orward-looking statements are not promises or guarantees and investors are cautioned that all forward-looking statements involve risks and uncertainties, including . . . reliance on key strategic alliances."[30]

### *CEO Crew's remarks on Lannett's February 8, 2018 analysts' earnings call.*

On February 8, 2018, Lannett also held a quarterly earnings call in which CEO Crew fielded questions from analysts.[31]  This appears to be his first analysts call as Lannett's CEO.  At the start of the call, Robert Jaffe of Lannett cautioned "[t]he company's discussion will include forward-looking information, reflecting management's current forecast of certain aspects of the company's future, and actual results could differ materially from those stated or implied."[32]  CEO Crew addressed Mr. Bedrosian's new advisory role with Lannett focused on "key" partnerships:

> I'm pleased to say that Arthur Bedrosian our former CEO has agreed to a strategic advisory role of the company.  He will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP and HTC among others.  I'm happy to have him on board and look forward to continue to work together.[33]

An analyst asked CEO Crew where Lannett stood "on locking down an arrangement with JSP to secure your most important, for now, product over the longer term?"[34]  CEO Crew, in response, emphasized JSP's significant shareholder investment in Lannett and signaled optimism about the prospects of renewal:

> Let me start with the JSP licensure first.  Obviously it's a critical important relation [sic] we look forward to expanding that relationship overtime [sic].  We obviously have a very long mutually beneficial relationship with the [sic] JSP, they are a **significant shareholder** and would be happy to add that to their share base.  I'm optimistic, because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past.  Please note as we've announced earlier and I noted in my remarks, we have retained [Mr. Bedrosian] to facilitate and guide exactly such transactions and conversations and transitions, and look forward to doing that with them.  The timeline of these sorts of transactions have their own pacing.  But it's clearly a priority and we're optimistic that well [sic] come to a good position in a relatively not-too-distant future.[35]

CEO Crew, responding to another question about Lannett's relationship with JSP, again struck an optimistic tone about the prospects of renewal but declined to "speculate" as to the outcome:

> Again on — there's two parties in the negotiation, we're going to have that conversation with them in terms of things that matter to them and things that matter to us.  I want to stress that we — it's a long-term relationship with a lot of moving parts, shareholder relationships, share repurchase opportunities which I think is disclosed in all of our documents and again working with [Mr. Bedrosian] to find the way that makes sense for them and us in the way we move forward, as quickly as possible.
>
> So there's a renewal component as it relates to the current contract, but we would sit down with them and find out what are the things that they most care about in order to make the productive conversation, so I won't speculate here on those moving parts but just please trust that [] it is an incredibly high priority for us and that we are working with all the folks in the company, before I came and while I am here, to make sure that comes to a great outcome for both parties.[36]

### CEO Crew's remarks on Lannett's May 7, 2018 analysts' call.

Lannett held its next quarterly earnings call with analysts on May 7, 2018.[37]  As he did on

the February 8, 2018 call, Robert Jaffe again cautioned listeners CEO Crew would make forward-

looking statements.[38]  An analyst asked CEO Crew: "Just on your JSP situation, sort of the elephant

in the room. . . . Is there anything you could tell us about under what circumstances you would not

proceed with extending that collaboration in some way?  Just want to understand whether you're

sounding confident about getting something done versus something that looks a particular way."[39]

CEO Crew acknowledged the importance of renewal and praised the quality of the JSP team, but

again offered no more than optimism about the future:

> Yeah.  It's a big beautiful elephant.  We embrace that as an organization.  Look,
> I've met with the team.  We speak with them regularly.  They're terrific folks.
> They're savvy managers.  We have a great dialog on an ongoing basis, all the
> various moving parts and I believe they are very supportive of the initiatives that
> we've been talking about.  I don't want to put the cart in front of the horse, elephant
> aside, but I'm optimistic that we'll get a chance to renew this agreement when it's
> right for both parties.  There is clearly nothing more important to our business than
> doing so and we'll continue to be focused on doing just that.[40]

### Lannett's May 8, 2018 quarterly report.

On May 8, 2018, Lannett filed its quarterly report with the Securities and Exchange

Commission (Form 10–Q) for the quarter ending March 31, 2018.[41]  The May 2018 quarterly

report, like the February 2018 quarterly report, described Lannett's contract with JSP and the risks

of such a relationship.  In a section entitled, "Material Contracts with Suppliers," Lannett described

the possibility of an additional extension and cautioned it must meet its minimum purchase

requirements to avoid breach of the current contract:

> If the parties agree to a second five-year extension from March 23, 2019 to March 23, 2024,
> the Company is required to issue to JSP or its designees an additional 1.5 million shares of
> the Company's common stock.  Both Lannett and JSP have the right to terminate the
> contract if one of the parties does not cure a material breach of the contract within thirty

(30) days of notice from the non-breaching party. During the renewal term of the JSP Distribution Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. There is no guarantee that the Company will be able to meet the minimum purchase requirements. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Distribution Agreement.[42]

The May 2018 quarterly report, like the February 2018 report, also generally cautioned "[f]orward-looking statements are not promises or guarantees and investors are cautioned that all forward-looking statements involve risks and uncertainties, including . . . reliance on key strategic alliances."[43]

### CEO Crew's remarks on the May 9, 2018 Deutsche Bank Health Care conference call.

CEO Crew "participated in the Deutsche Bank Health Care Conference" on May 9, 2018.[44] At the beginning of his presentation, CEO Crew cautioned he would "be making some forward-looking statements."[45] CEO Crew listed Lannett's suppliers on a slide and, "address[ing] Lannett's key partnership with JSP," said:

[A]s you've seen if you've been tracking the company of late, we do want to continue to leverage our mid-market position where we see the generic as a big blue ocean of opportunity that is providing many opportunities first to our business, and position ourself as a partner of choice for these companies.

A number of other suppliers, you see them on the right side of the slide have — they're believing in that positioning and bringing their products to us. Everything from long-standing partnerships with Jerome Stevens, the basis of our levothyroxine product as well as new partners from Aralez to Sciecure to Cerovene and Dexcel and others. And we look forward to their contributions to our revenues as we move forward.[46]

An analyst sought information about the future of the Lannett-JSP relationship. "Missing from that slide is your prediction of what will actually happen with the durability of the product for you and your relationship," the analyst said, "[s]o here's your opportunity to clarify what is going to happen."[47] CEO Crew, in response, pointed to JSP's significant holdings in the company as a reason to be confident about renewal:

So I think I alluded in [sic] every company has its concerns and issues. What Gregg is referring to here is our contract with this long-term partnership JSP. It does have a technical expiration date of March of next year. And I think some of the concerns for our company and the valuations you see is about the persistency of that contract. While again, I'm very careful not to indicate what another party will do, our partners at Jerome Stevens are proud, bright and capable businessmen, and they don't need me to speak for them relative to their exact intentions. And I wouldn't presume to do so.

However, I would note that they're **one of our largest shareholdings** with the company and they are businessmen that are closely watching the sort of changes we're making to the business, and I believe applaud it. And as a result, I'm confident when their time is ready, we'll get to that renewal.[48]

### *Lannett announces no extended deal with JSP on August 20, 2018.*

Despite CEO Crew's confidence, the parties did not agree to extend their contract. "On August 20, 2018, prior to market opening," Lannett announced in a press release "its distribution agreement with Jerome Stevens Pharmaceuticals (JSP), which expires on March 23, 2019, will not be renewed."[49] "While we are disappointed," Lannett announced, "and intend to redouble our continuing efforts to explore options for addressing our capital structure, we have been preparing for this contingency, knowing that this outcome was a possibility."[50]

"On this news, Lannett's share price fell $8.15, or 60.3%, to close at $5.35 on August 20, 2018."[51] The shareholders now allege several former Lannett employees, including a Director of Procurement, an SAP analyst, two Regional Sales Directors, and a National Sales Director "were not surprised when the Agreement was not renewed."[52] The JSP Agreement expires on March 23, 2019.[53]

## II. Analysis

Robert Strougo sued Lannett Company, Inc., Lannett Chief Executive Officer Timothy C. Crew, and Lannett Chief Financial Officer/Treasurer Marty P. Galvan[54] on behalf of a putative class of shareholders under the Securities Exchange Act of 1934.[55] We later granted Soe Wong and Michael Hoeltzel's motion to serve as lead plaintiffs.[56] On December 26, 2018, Messrs. Wong

and Hoeltzel filed an Amended Class Action Complaint alleging Lannett, CEO Crew and CFO Galvan violated §§ 10(b) and 20(a) of the '34 Act and Rule 10b-5.[57]

Messrs. Wong and Hoeltzel focus their claims on statements Lannett made in its February 8, 2018 and May 8, 2018 quarterly reports, statements CEO Crew made during Lannett's February 8, 2018 and May 7, 2018 quarterly earnings calls, as well as statements CEO Crew made during the Deutsche Bank Health Care Conference Call of May 9, 2018.[58] Messrs. Wong and Hoeltzel argue Lannett materially misled investors by failing to accurately disclose the substantial likelihood Lannett would not renew the JSP Agreement, leading investors instead to believe renewal constituted a "sure thing."[59] Defendants move to dismiss the complaint in its entirety.[60] After careful review under the heightened pleading standards applicable to private securities cases, we find actionable only CEO Crew's allegedly misleading February 8, 2018 statement describing JSP as a "significant shareholder"[61] and CEO's Crew's allegedly misleading May 9, 2018 statement describing JSP as "one of our largest shareholdings."[62]

Section 10(b) of the '34 Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of registered securities.[63] "Parties injured by securities fraud may bring a private cause of action under Section 10(b), which requires proof of six elements: '(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss."[64] Lannett argues Messrs. Wong and Hoeltzel fail to plead a material misrepresentation or omission and fail to show scienter. [65]

"All securities fraud claims are subject to [Federal Rule of Civil Procedure] 9(b), which requires plaintiff to 'state with particularity the circumstances constituting fraud or mistake.' "[66] Plaintiffs alleging securities fraud also must meet the face the heightened pleading standard of the Private Securities Litigation and Reform Act of 1995 ("PSLRA").[67] "The PSLRA imposes two exacting and distinct pleading requirements for securities fraud actions."[68] "First, 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' "[69] "Second, 'the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' "[70]

## A.  Lannett's alleged materially misleading statements and omissions.

"The first step for a Rule 10b–5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."[71]  "A statement or omission 'is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].' "[72]  "A material misrepresentation or omission is actionable if it 'significantly altered the "total mix" of information made available.' "[73]  While the trier of fact ordinarily decides questions of materiality, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law."[74]

"A statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it."[75]  An omission is misleading if a plaintiff alleges "some fact, known to

defendants at the time of the statements, the disclosure of which would have made the statement clearer or more correct."[76] The plaintiff must also "demonstrate that, without the undisclosed fact, a reasonable investor was likely to be misled by the statement."[77]

Messrs. Wong and Hoeltzel assert theories of liability based on misrepresentation and omission. They contend CEO Crew misled investors in statements during Lannett's February 8, 2018 and May 7, 2018 quarterly earnings calls and the May 9, 2018 Deutsche Bank Health Care Conference Call by conveying renewal of the JSP Agreement as "a sure thing."[78] Messrs. Wong and Hoeltzel argue CEO Crew's statements of optimism regarding renewal of the JSP Agreement materially misled investors because they "created the false impression that the relationship would continue."[79] Messrs. Wong and Hoeltzel argue Lannett's February 8, 2018 and May 8, 2018 quarterly reports misled investors by disclosing only the risk "Lannett could fail to meet the minimum purchase requirements, not that JSP could or would fail to renew the contract or cease supplying Lannett."[80] They argue once Lannett spoke about the chances of renewing the JSP Agreement, Lannett incurred a duty to disclose facts necessary to make their statements not misleading. They argue their lawsuit "is premised upon Defendants' failure to accurately disclose the risks Lannett faced in terms of renewing the JSP Agreement."[81]

Lannett disagrees. To the extent Messrs. Wong and Hoeltzel premise their claims on misrepresentation, Lannett argues its statements did not materially mislead investors. Lannett argues the statements constituted inactionable statements of corporate optimism, and a statutory safe-harbor provision renders the various forward-looking statements inactionable. And Lannett argues to the extent Messrs. Wong and Hoeltzel premise their claims on alleged omissions, Lannett had no duty to disclose, but, even if it did, Messrs. Wong and Hoeltzel fail to allege material facts Lannett should have disclosed to make their statements not misleading.

## 1. Optimistic opinion statements or omissions are not actionable.

### a. CEO Crew's statements of corporate optimism do not give rise to liability.

"[A] company may be liable under Section 10b for misleading investors when it describes as hypothetical a risk that has already come to fruition."[82]  But "[m]aterial representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."[83]  Such statements " 'constitute no more than 'puffery' and are understood by reasonable investors as such.' "[84]  "Claims that these kinds of vague expressions of hope by corporate managers could dupe the market have been almost uniformly rejected by the courts."[85]  Courts have dismissed claims based on statements about ongoing negotiations where the defendant "disclose[d] that negotiations were ongoing and did not express certainty as to the outcome of the parties' discussions"[86] or whether "deals would be struck by a certain date."[87]  Many of CEO Crew's statements include vague expressions of hope, lacking certainty, which he often buttressed with disclaimers he could not predict JSP's decision.[88]

Beginning with the February 8, 2018 Earnings Call, CEO Crew made several vague expressions of hope when an analyst asked where Lannett stood on securing a renewal of the JSP Agreement.  For instance, CEO Crew said:

❖ "[W]e *look forward* to expanding that relationship overtime."

❖ "*I'm optimistic*, because of the number of things we have going on between the two companies that there is a big need to continue to partner as we have in the past."

❖ "But it's clearly a priority and *we're optimistic* that well [sic] come to a good position in a relatively not-too-distant future."

❖ "[J]ust please trust that [] it is an incredibly high priority for us and that *we are working* with all the folks in the company, before I came and while I am here, to make sure that comes to a great outcome for both parties."

CEO Crew peppered optimistic outlooks with disclaimers:

- ❖ "The timeline of these sorts of transactions *have their own pacing*."

- ❖ "Again on — *there's two parties in the negotiation*, we're going to have that conversation with them in terms of things that matter to them and things that matter to us."

- ❖ "*I want to stress that we — it's a long-term relationship with a lot of moving parts, shareholder relationships, share repurchase opportunities* which I think is disclosed in all of our documents and again working with [Mr. Bedrosian] to find the way that makes sense for them and us in the way we move forward, as quickly as possible."

- ❖ "So there's a renewal component as it relates to the current contract, but we would sit down with them find and out what are the things that they most care about in order to make the productive conversation, *so I won't speculate here on those moving parts.*"

CEO Crew took a similar tact in responding to analyst questions on the May 7, 2018 earnings call. In response to an analyst question about the renewal—which the analyst called the "elephant in the room"—CEO Crew answered in general terms:

- ❖ "We embrace that as an organization. Look, I've met with the team. We speak with them regularly. They're terrific folks. They're savvy managers. We have a great dialog on an ongoing basis, all the various moving parts and *I believe* they are very supportive of the initiatives that we've been talking about."

- ❖ "*I'm optimistic* that we'll get a chance to renew this agreement when it's right for both parties. There is clearly nothing more important to our business than doing so and we'll continue to be focused on doing just that."

Again, CEO Crew buttressed these statements with disclaimers about his confidence:

- ❖ "Yeah. It's a *big beautiful elephant*. We embrace that as an organization."

- ❖ "We have a great dialog on an ongoing basis, *all the various moving parts*."

- ❖ "*I don't want to put the cart in front of the horse*, elephant aside."

On the May 9, 2018 Deutsche Bank Health Care Conference Call, CEO Crew fielded questions about the renewal for a third time. And for a third time, he expressed only general optimism:

- ❖ "However, I would note that [JSP is] one of our largest shareholdings with the company and they are businessmen that are closely watching the sort of changes we're making to the business, and *I believe applaud it.* And as a result, *I'm confident when their time is ready*, we'll get to that renewal."

And again, CEO Crew included cautions:

- ❖ "So I think I alluded in [sic] *every company has its concerns and issues*."

- ❖ "I think *some of the concerns for our company and the valuations you see is about the persistency of that contract*."

- ❖ "While again, *I'm very careful not to indicate what another party will do*, our partners at Jerome Stevens are proud, bright and capable businessmen, and *they don't need me to speak for them relative to their exact intentions. And I wouldn't presume to do so*."

CEO Crew's statements reflect general optimism Lannett and JSP would renew the JSP Agreement. The statements do not portray renewal as a "sure thing" or provide a definitive time when the parties would renew the JSP Agreement. Instead, every time CEO Crew discussed the negotiations, he expressed only optimism, confidence, or a belief something good would happen. Statements using words like "believe" are themselves "couched in cautionary terms."[89] CEO Crew never predicted a particular date on which the parties would renew the contract. In fact, CEO Crew never affirmatively predicted JSP would agree to renew the agreement. He consistently used vague language after expressing optimism, like "we're optimistic that we'll *come to a good position* in a *relatively not-too-distant future*"; "I'm optimistic that we'll get a *chance* to renew this agreement when it's right for both parties"; and "I'm confident when their time is ready, we'll *get to that renewal*." Reasonable shareholders would understand CEO Crew's statements as immaterial corporate optimism, reflecting nothing more than hope "that talks would go well."[90]

Also undermining Messrs. Wong and Hoeltzel's claim CEO Crew portrayed renewal as a "sure thing" are the various disclaimers in the statements.[91] CEO Crew told analysts "there's two parties in the negotiation"; he would not "speculate here on those moving parts"; he called the renewal "a big beautiful elephant [in the room]"; he noted he did not "want to put the cart in front of the horse"; he explained "some of the concerns for our company" included the "persistency of that contract"; he noted "I'm very careful not to indicate what another party will do"; and he "wouldn't presume to" speak for JSP. CEO Crew did not disregard or even downplay the proverbial "elephant in the room"—instead, he affirmatively "embrace[d]" what he called the "big beautiful elephant" in the room.[92] A reasonable speaker would not use such language if renewal were a "sure thing."

Unpersuaded by CEO Crew's repeated cautious optimism, Messrs. Wong and Hoeltzel argue these disclaimers somehow rendered CEO Crew's disclosures even more misleading. They argue "by first proclaiming his mindfulness not to speak out of turn, [CEO Crew] signaled to investors that his subsequent assurances about the renewal were made only after due consideration and a deliberate decision to speak."[93] They could have a point if CEO Crew said something like, "While obviously I cannot speak for JSP, we're going to get this deal done." But, as we set out above, CEO Crew said no such thing. And lacking any authority on point from Messrs. Wong and Hoeltzel, we decline to hold all such cautionary statements are meaningless surplusage when corporate officers routinely use them to address with nuance and detail matters essential to the corporation. CEO Crew's warnings were enough to rid CEO Crew's statements of any confidence on which reasonable shareholders could rely.

Messrs. Wong and Hoeltzel also argue CEO Crew's remarks included statements implying the Lannett-JSP relationship would continue. For example, CEO Crew said the companies have a

"number of things" going on between them, Mr. Bedrosian's plans to strengthen Lannett's relationships with key business partners, and the Lannett relationship with JSP is a mutually beneficial one. But Messrs. Wong and Hoeltzel do not identify facts showing the statements are false. The statements themselves, accompanied by general statements of optimism, are not material to a reasonable shareholder because a reasonable shareholder would interpret them to mean just what they say—the JSP Agreement constituted an important part of Lannett's business and Lannett hoped to renew it. And no party disputes the fact JSP and Lannett engaged in negotiations to renew the parties' contract.

### b. CEO Crew's characterization of the contract's "technical" expiration date is surrounded by cautionary statements and not material.

Messrs. Wong and Hoeltzel allege CEO Crew's description of the JSP Agreement's expiration date as "technical" misled investors. At the May 9, 2018 Deutsche Bank Health Care Conference, an analyst asked CEO Crew "to clarify what is going to happen" with the JSP contract.[94] CEO Crew responded, in relevant part:

> So I think I alluded in [sic] every company has its concerns and issues. What Gregg is referring to here is our contract with this long-term partnership JSP. *It does have a technical expiration date of March of next year.* And I think some of the concerns for our company and the valuations you see is about the persistency of that contract. While again, I'm very careful not to indicate what another party will do, our partners at Jerome Stevens are proud, bright and capable businessmen, and they don't need me to speak for them relative to their exact intentions. And I wouldn't presume to do so.

> However, I would note that they're one of our largest shareholdings with the company and they are businessmen that are closely watching the sort of changes we're making to the business, and I believe applaud it. And as a result, I'm confident when their time is ready, we'll get to that renewal.[95]

In common parlance, "[t]echnical" means "based on or marked by a strict or legal interpretation."[96] An investor could construe the statement to mean renewal constituted an inevitability and the expiration date constituted a mere technicality. But it is also possible an

investor could construe the statement to mean the present contract, as a matter of fact, expires March of next year. Regardless of which interpretation governs, a reasonable shareholder could only find the usage misleading if she took the statement out of context from the forward-looking statements surrounding it.

We agree with Defendants the Safe Harbor provision shields CEO Crew's statements from liability. The PSLRA includes a safe harbor provision which protects forward-looking statements from liability.[97] A "forward-looking statement" includes

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C).[98]

"The Safe Harbor provision . . . immunizes from liability any forward-looking statement, provided that: [1] the statement is identified as such and accompanied by meaningful cautionary language; [2] or is immaterial; or [3] the plaintiff fails to show the statement was made with actual knowledge of its falsehood."[99]  "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."[100]  "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."[101]  But where present-tense statements cannot "meaningfully be distinguished from the future projection of which they are a part," the present-tense statements are still forward-looking.[102]  CEO Crew's statement falls into

this latter category, as it is inextricably tied to his forward-looking statements about the contract negotiations.

Our finding accords with two of our Court of Appeals' holdings. In *Institutional Investors Group v. Avaya, Inc.*,[103] investors challenged defendants' statements "[o]ur first quarter results position us to meet our goals for the year" and "we are on track to meet our goals for the year."[104] The investors argued the phrases "position us" and "on track" constituted present statements not subject to the statutory safe harbor. Our Court of Appeals disagreed. It reasoned the statements did not "justify the financial projections in terms of any particular aspect of the company's current situation; they say only that, whatever that situation is, it makes the future projection attainable."[105] The statements only expressed the defendants' "continuing comfort" with their earlier projections.[106] Much like the "position us" and "on track" statements in *Avaya*, CEO Crew's use of the term "technical" simply expressed his "continuing comfort" with the state of Lannett's negotiations. He believed the parties would renew the contract, so he found the expiration date only technical. CEO Crew did not assert an actual fact by using the term.

In *In re Aetna Securities Litigation*,[107] investors challenged several of defendant's statements in which it called the policy it used to price premiums "disciplined."[108] Investors argued the word "disciplined" constituted a present-sense description of the company's pricing. Our Court of Appeals held "to the extent that 'disciplined' pricing said anything about the current price of premiums, it did so in the form of a projection" because whether defendant's "pricing was, in fact, disciplined could not have been determined at the time defendants made the statements."[109] The words "disciplined" and "technical" are analogous because their accuracy was unclear at the time the defendants said them.

To qualify for the Safe Harbor, CEO Crew must also show his statement is "accompanied by meaningful cautionary language."[110] He does. CEO Crew followed his "technical" comment with the statements, "I'm very careful not to indicate what another party will do," and he "wouldn't presume to" speak for JSP's "exact intentions" in the negotiations.[111] "I'm confident when their time is ready," he added, "we'll get to that renewal."[112] Such forward-looking projections of cautionary language are bound up with CEO Crew's use of the word technical. The Safe Harbor applies.

### c. Omission claims are not actionable.

Messrs. Wong and Hoeltzel alternatively argue Lannett failed to disclose facts related to the JSP Agreement needed to make its statements non-misleading. "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."[113] Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.' "[114] "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."[115]

This case resembles the District Court for the Southern District of New York's decision in *In re Express Scripts Holding Co. Securities Litigation*.[116] Investors alleged defendant made statements regarding ongoing negotiations with another company, but defendant failed to disclose the deteriorating nature of the companies' relationship, including two notices of breach the company sent defendant regarding their earlier contract.[117] The defendants made statements expressing uncertainty in the outcome of negotiations, like "[w]e would love to get an extension as part of this negotiation, but that[] remains to be seen at this juncture."[118] Despite the undisclosed information, the court found no duty to disclose because the plaintiffs failed to identify a fact

triggering a duty to disclose before defendant made statements expressing uncertainty in the outcome of the negotiations.[119] "Where an outcome is merely speculative," the court found, "the duty to disclose does not attach."[120]

Much like *Express Scripts*, Messrs. Wong and Hoeltzel fail to plead material facts Lannett did not disclose to make their statements not misleading. And unlike here, the Defendants in *Express Scripts* even received notices of breach of their prior contract before their negotiations— here, by contrast, there are no such similar allegations of notice.[121] Messrs. Wong and Hoeltzel argue Mr. Bedrosian's removal from the position of CEO doomed the JSP Agreement, citing as evidence confidential sources[122] from within Lannett who opined the parties would not renew the agreement after Mr. Bedrosian stepped down, Mr. Bedrosian's sale of Lannett stock in November 2017,[123] and the favorable terms of the agreement to Lannett. But CEO Crew disclosed Mr. Bedrosian's new strategic position with Lannett.[124] And CEO Crew had no duty to speculate any of the circumstances surrounding Mr. Bedrosian's departure meant the negotiations would go poorly.

Messrs. Wong and Hoeltzel repeatedly plead Lannett failed to disclose the "imminent risk" or any risk of the non-renewal of the JSP Agreement, but Lannett repeatedly cautioned about the risks of the deal in its SEC filings. We question whether Lannett had to disclose a risk so obvious, based on the frequency with which analysts asked CEO Crew about the negotiations. But even so, Lannett *did* caution about risks related to the JSP Agreement in its SEC filings. In its June 30, 2017 annual report (Form 10-K), Lannett disclosed it materially relied on an uninterrupted supply of products from JSP, and Lannett's operating results would suffer should "we experience an interruption of that supply." Lannett advised the JSP Agreement expires on March 23, 2019. It warned temporary or permanent business interruptions to JSP could materially adversely affect its

operating results, and it did not have a second source for the products JSP provided. It also cautioned JSP would terminate the agreement should Lannett fail to meet minimum purchase requirements. While none of Lannett's disclosures explicitly say "JSP may unilaterally choose not to renew the agreement," the wording of Lannett's disclosures made such an obvious principle clear. The amendment to the JSP Agreement disclosed the parties agreed to discuss a "mutual extension." And Lannett phrased the renewal as a mere possibility—"*if the parties agree* to a second five year extension."

Messrs. Wong and Hoeltzel fail to allege facts showing the negotiations had soured,[125] JSP represented non-renewal as an inevitability,[126] or the employees practiced malfeasance.[127] Messrs. Wong and Hoeltzel cite no case in which a court found omission-based liability where the plaintiffs did not plead facts the defendants knew making non-renewal evident. Instead, they only cite cases where the defendant failed to disclose an affirmative material fact. Their allegations "amount to little more than a suggestion that [Lannett] should have somehow guessed the outcome of the ongoing negotiations sooner or approached their negotiations with [JSP] more pessimistically."[128]

### 2. CEO Crew's February 8, 2018 and May 9, 2018 statements based on JSP's shareholder status may proceed into discovery.

Messrs. Wong and Hoeltzel plausibly allege CEO Crew's statements describing JSP's "significant" and "large" shareholder status inaccurately represented JSP's investment in Lannett. During the February 8, 2018 Earnings Call, CEO Crew called JSP a "significant shareholder." Months later, on the May 9, 2018 Deutsche Bank Health Care Conference Call, CEO Crew responded to a question about the parties' relationship, "I would note that [JSP is] one of our largest shareholdings with the company." Messrs. Wong and Hoeltzel argue these statements constituted affirmative falsehoods because JSP never appeared in any SEC documents as a beneficial owner of Lannett; JSP, they allege, instead liquidated its Lannett shares as soon as it received them.

JSP's shareholder status may be material to a reasonable investor because it affects whether JSP possessed a vested interest in the value of Lannett stock, which in turn affects whether JSP had an interest in renewing the JSP Agreement. Lannett does not dispute the materiality of the JSP Agreement—nor could it, as its SEC disclosures caution it "materially rel[ies]" on an uninterrupted supply of drugs from JSP, and sales of levothyroxine and digoxin constituted 37 percent of Lannett's net sales in 2018 and 29 percent of its sales in 2017. JSP's decision to agree to renewal of the JSP Agreement could drastically affect Lannett's stock price, as shown by the market analysts' consistent questions regarding renewal. Upon Lannett's August 2018 announcement the parties would not renew the JSP Agreement, Lannett's stock price dropped by 60.3 percent. While our Court of Appeals directs us to eschew "rule of thumb" quantitative measure of materiality, a 60.3 percent drop in stock price materially affects value.[129] In these important negotiations involving only two parties, whether one party has a vested interest in the success of the other party may be a material inquiry.

And the alleged falsity of the statement is apparent. CEO Crew portrayed Lannett and JSP as symbiotic. The publicly available terms of the parties' agreements supported such a conclusion because Lannett compensated JSP in Lannett stock. This arrangement tethered JSP to Lannett's future—assuming, of course, JSP kept its ownership stake in the Lannett. Messrs. Wong and Hoeltzel claim when CEO Crew spoke on the February 8, 2018 earnings call and the May 9, 2018 Deutsche Bank Health Care conference call, JSP was already liquidating its holdings in Lannett, and "had already begun forming a strategic alliance with another distributor of levothyroxine."[130] Unlike CEO Crew's statement describing the contract's termination date as "technical," his statements describing the present status of JSP's investment in Lannett is neither a general statement of optimism nor a statement inextricably bound up in forward-looking statements.

While JSP may at one time have been a "significant" or "one of [the] largest" holders of Lannett stock, Plaintiffs plausibly allege CEO Crew's misstated JSP's ownership status at the time he spoke.

Defendants counter such "information was known to the market."[131]  They cite only a blog post in which the author speculates, "JSP does not show up as a holder so I assume they are selling shares of LCI when they are granted."[132]  But "I assume" hardly conveys a widespread market belief.  If anything, such uncertainty about JSP's status as a shareholder bolsters the plausibility of Plaintiffs' claims.  In any event, "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."[133]  We agree, and for the same reason, we decline to accept Defendants' speculation "[i]nstead of regularly liquidating Lannett shares, it is likely that JSP structured ownership among JSP's designee's without incurring filing obligations."[134]  Defendants are free to develop and present such a fact defense at summary judgment or at trial, but we decline to draw such a substantial inference in their favor at the pleading stage.

### B. Plaintiffs plead scienter for the shareholder statements.

"The PSLRA requires plaintiffs in securities class actions to 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"[135] The requisite state of mind, i.e., scienter, is "a 'knowing or reckless' mental state 'embracing intent to deceive, manipulate, or defraud.'"[136]  "Recklessness," however, "is 'not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"[137]  To satisfy this exacting pleading standard,

"an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[138]

The totality of circumstances gives rise to an inference of recklessness sufficient to survive a motion to dismiss. These are statements of fact at a point in time. This is not an opinion. CEO Crew expressed knowledge of this fact. He either intentionally or recklessly reported JSP's share ownership. At this preliminary stage, we cannot find CEO Crew would have negligently reported this fact.

JSP's status as a significant or larger shareholder of Lannett stock would have been critical to the prospect of the contract's renewal. While discovery may prove different, we cannot presently imagine why CEO Crew would describe JSP's significant or large shareholder interest for a reason other than offering comfort to the shareholders. An individual or entity holding "significant" equity in an organization would be less likely to make a decision materially harming such an enterprise in which they are invested. But we are also mindful JSP is not a defendant here. Defendants' conduct, not JSP's, is at issue. Messrs. Wong and Hoeltzel allege these statements are false. We credit at this stage, as we must, their claims JSP liquidated its stock in Lannett, and find repeated misstatements would present such a substantial risk of misleading investors. Recklessness may be appropriately inferred.

### C. Defendants present no basis to dismiss Plaintiff's control-person liability claim.

"The Securities Exchange Act of 1934 Section 20(a) imposes liability on controlling persons who aid and abet violations of the Act."[139] "To recover under Section 20(a), a plaintiff must show: (1) one person controlled another person or entity; (2) that the controlled person or entity committed a primary violation of the securities laws; and (3) that the defendant was a culpable participant in the fraud."[140] Defendants address Messrs. Wong and Hoeltzel's control-

person liability theory in one sentence: "Because Plaintiffs have failed to allege a predicate violation of Section 10(b), their claims arising under Section 20(a) must be dismissed."[141]  While it is true the failure to plausibly allege a predicate violation is fatal to a claim under Section 20(a), Messrs. Wong and Hoeltzel have plausibly alleged a claim.  Given their allegations of CEO Crew and CFO Galvan's "power to influence and control public statements,"[142] their Section 20(a) claims may therefore proceed to discovery.[143]

## III. Conclusion

Messrs. Wong and Hoeltzel plausibly allege Lannett materially misstated the true nature of JSP's status as a Lannett shareholder on February 8 and May 9, 2018.  Messrs. Wong and Hoeltzel otherwise fail to plausibly allege Lannett or its officers misstated the true nature of their negotiations with JSP or failed to disclose material facts regarding the negotiations.  We grant in part and deny in part Defendants' motion to dismiss in the accompanying Order.

---

[1] ECF Doc. No. 41 at ¶ 25.

[2] *Id.* at ¶ 26.

[3] *Id.* at ¶ 3.

[4] *Id.*

[5] ECF Doc. No. 41 at ¶¶ 3–4.  JSP also agreed to "supply Lannett with Butalbital with Aspirin, Caffeine and Codeine Phosphate capsules ("BACC").  ECF Doc. No. 48-2 at 8.

[6] ECF Doc. No. 41 at ¶ 3.

[7] *Id*.

[8] *Id.*

[9] *Id.* at ¶ 29.

[10] *Id.* at ¶ 63.

[11] *Id.* at ¶ 29.

[12] *Id.*

[13] *Id.*

[14] ECF Doc. No. 48-2 at 24.

[15] *Id.*

[16] *Id.* at 26 (emphasis added).

[17] ECF Doc. No. 41 at ¶ 46.

[18] The shareholders allege JSP "had a practice of liquidating the majority of its shares in Lannett as soon as it received them." *Id.*

[19] *Id.* at ¶ 27.

[20] *Id.*

[21] *Id.* at ¶¶ 26–27.

[22] *Id.* at ¶ 33. Mr. Bedrosian led Lannett's "very costly" acquisition of Kremers Urban Pharmaceuticals, Inc., which burdened the company with debt, required cuts to the workforce, and led Mr. Bedrosian to "precipitously" increase drug prices. *Id.* Mr. Bedrosian sold $2.5 million worth of Lannett stock in November 2017. *Id.* at ¶ 35.

[23] *Id.* at ¶ 33.

[24] *Id.* ¶¶ 6, 34 (internal quotation marks omitted).

[25] *Id.* at ¶ 38.

[26] ECF Doc. No. 48-2 at 60–61; *see also* ECF Doc. No. 41 at ¶ 39.

[27] ECF Doc. No. 48-2 at 63 ("Lannett Company, Inc.'s Annual Report on Form 10-K for the fiscal year ended June 30, 2017 includes a detailed description of its risk factors.").

[28] ECF Doc. No. 48-2 at 40.

[29] *Id.*

[30] *Id.* at 62.

[31] ECF Doc. No. 41 at ¶¶ 42–46.  We acknowledge the excerpted transcript Defendants attach to their motion dismiss lists February 7, 2018, as the date of the earnings call.  *See* ECF Doc. No. 48-2 at 53–54.  Because the source or authenticity of this document is not indisputable, and we must take all facts alleged in the complaint as true, we assume for purposes of our analysis the earnings call occurred on February 8, 2018.  Any question of fact as to the actual date may of course be addressed at summary judgment or trial.

[32] ECF Doc. No. 48-2 at 54.

[33] ECF Doc. No. 41 at ¶ 42 (emphasis omitted).

[34] ECF Doc. No. 41 at ¶ 43; *see* ECF Doc. No. 48-2 at 55.

[35] ECF Doc. No. 41 at ¶ 43 (emphasis omitted and added).

[36] ECF Doc. No. 41 at ¶ 44 (emphasis omitted).

[37] *Id.* at ¶¶ 47–48; *see* ECF Doc. No. 48-2 at 77.

[38] ECF Doc. No. 48-2 at 77.

[39] ECF Doc. No. 41 at ¶ 47 (internal quotation marks omitted).

[40] ECF Doc. No. 41 at ¶ 47 (emphasis omitted).  Messrs. Wong and Hoeltzel allege at the time CEO Crew made this statement, "JSP had formed a relationship with the well-established levothyroxine distributor Gemini as well as liquidating the majority of the 5.5 million shares that JSP had been issued since 2004."  *Id.* at ¶ 48.

[41] *Id.* at ¶ 49.

[42] ECF Doc. No. 48-2 at 81.

[43] *Id.* at 82.

[44] ECF Doc. No. 41 at ¶ 53.

[45] ECF Doc. No. 48-2 at 84.

[46] ECF Doc. No. 41 at ¶ 53 (emphasis omitted).

[47] *Id.* at ¶ 54 (internal quotation marks omitted).

[48] *Id.* (emphasis omitted and added).

[49] *Id.* at ¶ 56 (internal quotation marks omitted).

[50] *Id.* (internal quotation marks omitted).

[51] *Id.* at ¶ 57.

[52] *Id.* at ¶ 36.

[53] *Id.* at ¶ 56.

[54] The operative complaint alleges Mr. Galvan "served as the Company's President of Finance, Chief Financial Officer, and Treasurer at all relevant times." ECF Doc. No. 41 at ¶ 20. For the reader's convenience, we occasionally refer to Mr. Galvan as "CFO Galvan."

[55] ECF Doc. No. 1.

[56] ECF Doc. No. 39.

[57] ECF Doc. No. 41.

[58] *Id.* at ¶¶ 38–55.

[59] ECF Doc. No. 52 at 1.

[60] ECF Doc. No. 48. When considering a motion to dismiss "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Insterstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;' " (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;' " and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[61] ECF Doc. No. 41 at ¶ 43.

[62] *Id.* at ¶ 54.

[63] 15 U.S.C. § 78j(a)(1).

[64] *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007)).

[65] *See* ECF Doc. No. 48-1 at 7–21 (addressing misstatement or omission); *id.* at 21–25 (addressing scienter).

[66] *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)).

[67] *See* 15 U.S.C. § 78u-4(b)(1).

[68] *Aetna*, 617 F.3d at 277.

[69] *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)).

[70] *Id.* at 277–78 (quoting 15 U.S.C. § 78u–4(b)(2)).

[71] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).

[72] *Aetna*, 617 F.3d at 283 (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[73] *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988)).

[74] *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 369 n.13 (3d Cir. 1993).

[75] *Anderson v. Stonemor Partners, L.P.*, 296 F. Supp. 3d 693, 700 (E.D. Pa. 2017) (citing *Wallace v. Sys. & Comput. Tech. Corp.*, No. 95-6303, 1997 WL 602808, at *9 (E.D. Pa. Sept. 23, 1997)).

[76] *Id.* (citing *In re Discovery Labs. Sec. Litig.*, No. 06-1820, 2006 WL 3227767, at *9 (E.D. Pa. Nov. 1, 2006)).

[77] *Id.* (citing *Discovery Labs*, 2006 WL 3227767, at *9).

[78] ECF Doc. No. 52 at 6.

[79] ECF Doc. No. 41 at ¶ 45 (February 8, 2018 quarterly earnings call); *see id.* at ¶ 48 ("The statements [on the May 7, 2018 quarterly earnings call] were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the JSP Agreement and instead created the false impression that the partnership would continue."); *id.* at ¶ 55 ("The statements [on the May 9, 2018 Deutsche Bank Health Care Conference Call] were materially false and misleading because they failed to disclose the imminent risk of the non-renewal of the distribution contract with JSP and instead perpetuated the false impression that the relationship would continue.").

[80] ECF Doc. No. 41 at ¶ 41 (February 8, 2018 quarterly report); *see id.* at ¶ 52 ("The only risk that Defendants disclose with regards to JSP [in the May 8, 2018 quarterly report] is that Lannett may

fail to meet the minimum purchase requirements, not that JSP may fail to renew the contract or discontinue supplying Lannett.").

81 ECF Doc. No. 52 at 10.

82 *Globus*, 869 F.3d at 242.

83 *Aetna*, 617 F.3d at 283.

84 *Id.* (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999)), *abrogation on other grounds recognized by City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 175 (3d Cir. 2014).

85 *Burlington Coat Factory*, 114 F.3d at 1427 (compiling cases).

86 *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 3338, 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017).

87 *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (rejecting theory of liability where the "public statements lack the sort of definite positive projections that might require later correction. The statements suggest only the hope of any company, embarking on talks with multiple partners, that the talks would go well. No identified defendant stated that he thought deals would be struck by a certain date, or even that it was likely that deals would be struck at all.").

88 Messrs. Wong and Hoeltzel plead Lannett's SEC statements "created the false impression that the relationship [with JSP] would continue." ECF Doc. No. 41 at ¶ 41. In their Memorandum in Opposition to Defendants' Motion to Dismiss, they clarify this allegation is premised on omission-based liability: "Lannett's discussion of the JSP Agreement in its February 8, 2018 and May 8, 2018 quarterly reports . . . [say] nothing about the . . . imminent risk of the JSP Agreement not being renewed." ECF Doc. No. 52 at 9 n.15.

89 *Pache v. Wallace*, No. 93-5164, 1995 WL 118457, at *4 (E.D. Pa. Mar. 20, 1995) ("I note that the idea that 'management *believes*' that certain factors will permit the company to operate at 'break-even or better' is itself couched in cautionary terms. (emphasis in original)) *aff'd*, 72 F.3d 123 (3d Cir. 1995). We are aware the court decided *Pache* before the PSLRA, but we find its reasoning persuasive in this context.

90 *Time Warner*, 9 F.3d at 267.

91 *See Pache*, 1995 WL 118457, at *4.

92 ECF Doc. No. 41 at ¶ 47.

93 ECF Doc. No. 52 at 8.

94 ECF Doc. No. 41 at ¶ 54.

[95] *Id.* (some emphasis added).

[96] *Technical*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/technical.

[97] *See* 15 U.S.C. § 78u–5.

[98] 15 U.S.C. § 78u-5(i)(1)(A–D).

[99] *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 254 (3d Cir. 2009) (citing 15 U.S.C. § 78u–5).

[100] *Id.* at 256 (quoting *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 243 n.3 (3d Cir.2004)).

[101] *Id.* at 255 (alteration in original) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

[102] *See Aetna*, 617 F.3d at 280 (quoting *Avaya*, 564 F.3d at 255).

[103] 564 F.3d 242 (3d Cir. 2009).

[104] *Id.* at 247.

[105] *Id.* at 255.

[106] *Id.* at 256.

[107] 617 F.3d 272, 280 (3d Cir. 2010).

[108] *Id.*

[109] *Id.* at 281.

[110] *Avaya*, 564 F.3d at 254.

[111] ECF Doc. No. 41 at ¶ 54.

[112] *Id.*

[113] *Globus*, 869 F.3d at 241 (alteration in original) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)).

[114] *Id.* (quoting *Matrixx Initiatives*, 563 U.S. at 44).

[115] *Id.*

[116] No. 16 3338, 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017).

[117] *Id.*

[118] *Id.* at *5.

[119] *Id.* at *13.

[120] *Id.* at *11 (citing *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)).

[121] We acknowledge the *Express Scripts* Defendants made statements expressing substantial uncertainty as to the outcome of negotiations. *Id.* at *5. We are aware *Express Scripts* is pending appeal in the United States Court of Appeals for the Second Circuit. Nonetheless, we find its reasoning persuasive on these analogous facts.

[122] We note Messrs. Wong and Hoeltzel do not plead how the confidential sources are qualified to opine on the importance of Mr. Bedrosian to the JSP Agreement, evidently asking us to assume they are reliable because they worked as sales directors. *See Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir. 2004) ("As a general matter, almost all of the anonymous sources are former Chubb employees. Plaintiffs fail to aver, however, when any of them were employed by Chubb. Nor do Plaintiffs allege the dates that these sources acquired the information they purportedly possess, or how any of these former employees had access to such information.").

[123] We note Mr. Bedrosian sold his stock before CEO Crew made a statement regarding the JSP Agreement, so Messrs. Wong and Hoeltzel's argument Lannett had a duty to disclose in November 2017 fails.

[124] ECF Doc. No. 41 at ¶ 42.

[125] *Express Scripts*, 2017 WL 3278930, at *13.

[126] *See Time Warner*, 9 F.3d at 267.

[127] *See Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007).

[128] *Express Scripts*, 2017 WL 3278930, at *13.

[129] *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 n.14 (3d Cir. 1996).

[130] ECF Doc. No. 41 at ¶ 46. Messrs. Wong and Hoeltzel repeat the substance of this allegation later in their Amended Complaint. *See id.* at ¶¶ 55, 66.

[131] ECF Doc. No. 48-1 at 16.

[132] ECF Doc. No. 48-2 at 42.

[133] *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *see Payne v. DeLuca*, 433 F. Supp. 2d 547, 559 n.7 (W.D. Pa. 2006) ("Truth-on-the-market analysis is intensely fact specific and thus seldom appropriate at the pleading stage.").

[134] ECF Doc. No. 48-1 at 17.

[135] *Globus*, 869 F.3d at 245 (quoting 15 U.S.C. § 78u–4(b)(2)).

[136] *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016) (quoting *Avaya*, 564 F.3d at 252).

[137] *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, No. 16-112, 2019 WL 351260, at *4 (D. Del. Jan. 29, 2019) (quoting *Avaya*, 564 F.3d at 267 n.42).

[138] *Globus*, 869 F.3d at 245 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

[139] *Aetna*, 617 F.3d at 285 (citing 15 U.S.C. § 78t).

[140] *Belmont v. MB Inv. Partners, Inc.*, No. 09-4951, 2010 WL 2348703, at *9 (E.D. Pa. June 10, 2010), *aff'd,* 708 F.3d 470 (3d Cir. 2013).

[141] ECF Doc. No. 48-1 at 20.

[142] *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 908 (E.D. Pa. 2018).

[143] Defendants present a similarly cursory argument regarding loss causation. They argue "Plaintiffs fail to allege any fact that was purportedly misrepresented or concealed, foreclosing Plaintiffs' ability to plead adequately loss causation." ECF Doc. No. 48-1 at 20 (internal citation omitted). But again, Plaintiffs allege a plausible claim. "To establish loss causation in a typical § 10(b) case, a plaintiff must show that its 'losses are related specifically to the market's discovery of the misrepresentation and the corresponding decrease in price due to that misrepresentation.'" *De Vito v. Liquid Holdings Grp., Inc.*, No. 15-6969, 2018 WL 6891832, at *38 (D.N.J. Dec. 31, 2018) (quoting *Pure Earth, Inc. v. Call*, 531 F. App'x 256, 260 (3d Cir. 2013)). Our Court of Appeals "has stated that loss causation is ordinarily an issue for the trier of fact." *Id.* at *40. Defendants may present compelling evidence at summary judgment or trial CEO Crew's statements surrounding JSP's shareholder status did not, in fact, cause the decline in Lannett's stock price on August 20, 2018 and shortly thereafter.