UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Robert Strougo, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Lannett Company, Inc., et al.<br><br>Defendants. | Case No. 2:18-cv-03635-MAK<br><br>Judge Mark A. Kearney |

**BRIEF IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION**

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT .......... 1

II. LEGAL STANDARD .......... 2

III. ARGUMENT .......... 3

A. The Proposed Settlement Warrants Final Approval Because It Is Fair, Reasonable, and Adequate. .......... 3

1. Plaintiffs' Motion for Preliminary Approval Demonstrated the Fairness, Reasonableness, and Adequacy of the Settlement. .......... 3

2. Additional Evidence Supports Granting Final Approval of the Settlement. .......... 4

3. Analysis of the *Girsh* Factors Confirms That the Settlement Is Fair, Reasonable and Adequate and Should Be Approved. .......... 4

4. The *Prudential* Considerations Also Support the Settlement .......... 13

B. The Plan of Allocation Is Fair, Reasonable, and Adequate. .......... 14

C. Notice to the Settlement Class Satisfies the Requirements of Rule 23, Due Process, and the PSLRA. .......... 16

D. Certification of the Settlement Class Remains Warranted .......... 20

IV. CONCLUSION .......... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993)........................................ 7

*Boyd v. Coventry Health Care Inc.*,
No. DKC09-2661, 2014 WL 359567 (D. Md. Jan. 31, 2014)........................................ 14

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981)........................................ 2

*Devlin v. Ferrandino & Son, Inc.*,
No. 15-4976, 2016 WL 7178338 (E.D. Pa. Dec. 9, 2016)........................................ 7

*Dura Pharms., Inv. v. Broudo*,
544 U.S. 336 (2005)........................................ 10

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010)........................................ 2, 8

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)........................................ 17

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975)........................................ passim

*Harlan v. Transworld Sys., Inc.*,
No. 13-5882, 2015 WL 505400 (E.D. Pa. Feb. 6, 2015)........................................ 7

*In re AT&T Corp. Sec. Litig.*,
455 F.3d 160 (3d Cir. 2006)........................................ 3

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007)........................................ 9

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
No. 07 Civ. 61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011)........................................ 6

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)........................................ passim

*In re Datatec Sys., Inc. Sec. Litig.*,
No. 04-CV-525 (GEB), 2007 WL 4225828 (D.N.J. Nov. 28, 2007)........................................ 9

*In re Gen. Instrument Sec. Litig.*,
209 F. Supp. 2d 423 (E.D. Pa. 2001)........................................ 15

*In re Gen. Motors Corp. Pick-Up Trucks Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995)........................................ 8, 9, 12

*In re Ikon Office Sols., Inc., Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)........................................ 9, 12, 14

*In re Johnson & Johnson Derivative Litig.*,
900 F. Supp. 2d 467 (D.N.J. 2012) .......... 13

*In re Linerboard Antitrust Litig.*,
296 F. Supp. 2d 568 (E.D. Pa. 2003) .......... 6

*In re Merck & Co. Vytorin ERISA Litig.*,
No. 08-CV- 285, 2010 WL 547613 (D.N.J. Feb. 9, 2010) .......... 14

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) .......... 2, 3, 13

*In re Ocean Power Techs., Inc.*,
No. 14 Civ. 3799, 2016 WL 6778218 (D.N.J. Nov. 15, 2016) .......... 10, 15

*In re Par Pharm. Sec. Litig.*,
No. 06 Civ 3226, 2013 WL 3930091 (D.N.J. July 29, 2013) .......... 5, 11, 12

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998) .......... 3, 12, 13

*In re Remeron Direct Purchaser Antitrust Litig.*,
No. 03-0085, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) .......... 2

*In re Rent-Way Sec. Litig.*,
305 F. Supp. 2d 491 (W.D. Pa. 2003) .......... 12

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
No. 08 Civ. 397, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) .......... 6

*In re Schering-Plough/ Merck Merger Litig.*,
No. 09-cv-1099, 2010 WL 1257722 (D.N.J. Mar. 26, 2010) .......... 9, 12

*In re Suprema Specialties, Inc. Sec. Litig.*,
No. 02 Civ. 168, 2008 WL 906254 (D.N.J. Mar. 31, 2008) .......... 5

*In re Veritas Software Corp. Sec. Litig.*,
396 Fed. Appx. 815 (3d Cir. 2010) .......... 18

*In re Viropharma Inc. Sec. Litig.*,
No. CV 12-2714, 2016 WL 312108 (E.D. Pa. Jan. 25, 2016) .......... 9, 10, 11

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) .......... 5, 7, 12

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985) .......... 11

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358 (S.D.N.Y. 2002) .......... 7

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972) .......... 2

*Saunders v. Berks Credit & Collections, Inc.*,
No. CIV. 00-3477, 2002 WL 1497374 (E.D. Pa. July 11, 2002) .......... 13

*Schuler v. Medicines Co.*,
No. CV 14-1149 (CCC), 2016 WL 3457218 (D.N.J. June 24, 2016).............................. 11

*Stoetzner v. United States Steel Corp.*,
897 F.2d 115 (3d Cir. 1990)........................................................................................ 7

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011)........................................................................................ 15

*Sutton v. Med. Serv. Ass'n of Pennsylvania*,
No. 92-4787, 1994 WL 246166 (E.D. Pa. June 8, 1994).................................................. 2

*Walsh v. Great Atl. & Pac. Tea Co.*,
96 F.R.D. 632 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983) .................................... 2

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*,
758 F.2d 86 (3d Cir. 1985)........................................................................................ 18

**Statutes**

Fed. R. Civ. P. 23 (b) ................................................................................................ 20

Fed. R. Civ. P. 23(a) ................................................................................................ 20

Fed. R. Civ. P. 23(c) ................................................................................................ 17

## I. PRELIMINARY STATEMENT

The Settlement pending before this Court is an exceptional result for the Class given the attendant risks to the Litigation. As explained by Lead Plaintiffs in support of their motion for preliminary approval, the Settlement provides a recovery of $300,000 plus up to an estimated $100,000 in settlement administration costs to be paid by Defendants. This did not come easily. Lead Plaintiffs fought with Defendants for over 8 months, filed an amended complaint, briefed an extensive motion to dismiss, and conducted discovery and reviewed approximately 1,000 pages of documents. Fortunately, despite the unfavorable information that was uncovered during the discovery phase, the time and effort invested in this case by Lead Plaintiffs and Lead Counsel has paid off and, with the Court's approval, the matter can finally reach a resolution that is in Class Members' best interests.

In exchange for the payment of $300,000 in cash for the benefit of the Settlement Class and up to $100,000 in estimated settlement administration costs, the Settlement will release all Released Parties from all Released Claims, as set forth in the Stipulation. The Settlement is not "claims-made" and all proceeds of the Settlement, after the deduction of Court-approved fees and costs, will be distributed to eligible claimants. Given the facts, the applicable law, and the risk and expense of continued litigation, Lead Plaintiffs and Lead Counsel submit that the proposed Settlement is fair, reasonable and adequate, represents a very favorable result, and is in the best interests of the Settlement Class.

Lead Plaintiffs also request that the Court approve the Plan of Allocation, which is set forth in the Notice that has been sent to Settlement Class Members. The Plan of Allocation, which was developed by Lead Plaintiffs' consulting damages expert in consultation with Lead Counsel, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on the losses in value of securities purchased or otherwise acquired during the Settlement Class Period. For the reasons set forth below, the Plan of Allocation is fair and reasonable, and should likewise be approved. Accordingly, Lead Plaintiffs respectfully

request that the Court approve the Settlement and the Plan of Allocation, and finally certify the Settlement Class.

## II. LEGAL STANDARD

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement must be approved by the Court upon a finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016); *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001). "The strong judicial policy in favor of class action settlement[s] contemplates a circumscribed role for the district courts in settlement review and approval proceedings." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010). Although this Court has discretion in determining whether to approve the Settlement, it should be hesitant to substitute its judgment for that of the parties who negotiated the Settlement. *See Sutton v. Med. Serv. Ass'n of Pennsylvania*, No. 92-4787, 1994 WL 246166, at *5 (E.D. Pa. June 8, 1994). "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement. . . . They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also Walsh v. Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642-43 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3d Cir. 1983).

In determining the adequacy of a proposed settlement, a court should ascertain whether the settlement is within a range that responsible and experienced attorneys could accept, considering all relevant risks. *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-0085, 2005 WL 3008808, at *4 (D.N.J. Nov. 9, 2005) (citing *Walsh*, 96 F.R.D. at 642). That analysis recognizes the "uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Id.* (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

The Court should also assess the reasonableness of the settlement pursuant to the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975):

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id*. at 157 (citation omitted); *see also In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 164-65 (3d Cir. 2006); *In re Nat'l Football League Players,* 821 F.3d at 437.

The Third Circuit also advises courts to consider, where applicable, the additional factors set forth in *In re Prudential Insurance Company America. Sales Practice Litigation Agent Actions*, 148 F.3d 283 (3d Cir. 1998):

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Id*. at 323; *In re Nat'l Football League Players,* 821 F.3d at 437.

## III. ARGUMENT

### A. The Proposed Settlement Warrants Final Approval Because It Is Fair, Reasonable, and Adequate.

#### 1. Lead Plaintiffs' Motion for Preliminary Approval Demonstrated the Fairness, Reasonableness, and Adequacy of the Settlement.

In moving for preliminary approval of the Settlement, Lead Plaintiffs complied with Rule 23(e)(1)(A) by making an evidentiary showing that the Court would "likely be able to . . . approve the [Settlement] under Rule 23(e)(2)" and "certify the class for purposes of judgment." FED. R. CIV. P. 23(e)(1)(B). Lead Plaintiffs submitted a declaration from Adam M. Apton, one of the lead attorneys on the matter, that outlined the litigation and described the basis for the Settlement. In

pertinent part, the declaration demonstrated the complexity of the case and the work that was performed in order to arrive at the proposed Settlement. Declaration of Adam M. Apton, Dkt. No. 69-2, ¶¶3-12. As evidence of the adequacy of the Settlement, Lead Plaintiffs contend that it is extremely likely that no recovery would have resulted from continued litigation in light of the documentary evidence received concerning the Surviving Claims. Apton Decl., at ¶¶10-12.

2. Additional Evidence Supports Granting Final Approval of the Settlement.

Lead Plaintiffs' motion for preliminary approval addressed each of the factors identified in Rule 23(e)(2). As additional evidentiary support for the Settlement, Lead Plaintiffs have submitted with their motion for final approval a supplemental declaration from Lead Counsel (the "Supp. Apton Decl."), declarations from each of the Lead Plaintiffs, and a declaration from the Claims Administrator. These declarations, as explained below, strengthen Lead Plaintiffs' basis for seeking final approval.

Lead Plaintiffs' declarations are submitted by Lead Plaintiffs Soe Wong and Michael Hoeltzel. *See* Declaration of Wong, ¶1; Declaration of Hoeltzel, ¶1. As described, Lead Plaintiffs were involved in the litigation from start to finish and assisted in (a) conferring with counsel concerning the issues and strategy in the case; (b) reviewing court filings in the Action and periodic reports from counsel concerning the work being done; (d) conferring with counsel with respect to settlement efforts; and (e) researching and collecting relevant documents in their possession. Declaration of Wong, ¶2; Declaration of Hoeltzel, ¶2. Lead Plaintiffs support the Settlement and request that it be finally approved. Declaration of Wong, ¶3; Declaration of Hoeltzel, ¶3.

3. Analysis of the *Girsh* Factors Confirms That the Settlement Is Fair, Reasonable and Adequate and Should Be Approved.

To determine whether a proposed settlement in a class action is fair, reasonable, and adequate, district courts in this Circuit consider the nine factors identified in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975). These factors strongly support approval of the Settlement.

**a) The Complexity, Expense and Likely Duration of This Action.**

The first *Girsh* factor looks to the "complexity, expense, and likely duration of the litigation." *Girsh*, 521 F.2d at 157. This factor addresses the "probable costs, in both time and money, of continued litigation." *Cendant*, 264 F.3d at 233 (citation and internal quotation marks omitted). A settlement is favored where "continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004). Courts have noted that "[s]ecurities fraud class actions are notably complex, lengthy, and expensive cases to litigate." *In re Par Pharm. Sec. Litig.*, No. 06 Civ 3226, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013). This case is no exception, which supports approval of the Settlement. *See, e.g.*, *In re Suprema Specialties, Inc. Sec. Litig.*, No. 02 Civ. 168, 2008 WL 906254, at *4-5 (D.N.J. Mar. 31, 2008) (finding complexity of securities class action supports final approval).

Here, achieving a litigated verdict in this Action for Lead Plaintiffs and the Settlement Class would require substantial additional time and expense. Lead Plaintiffs reasonably expect that the continued prosecution of this Action through class certification, the completion of discovery, summary judgment, and trial would have involved substantial additional work and expense that would not have necessarily resulted in a recovery for the Settlement Class. Additionally, based on the unfavorable discovery documents received by Lead Plaintiffs, this is especially so because continuing the Litigation would have likely resulted in the dismissal of the Surviving Claim.

To obtain a judgment at trial, Lead Plaintiffs would have had to complete and prevail on a contested motion for class certification, and any subsequent interlocutory appeals if a favorable decision was issued by this Court. Lead Plaintiffs would have to complete both fact and expert discovery. After the close of discovery, Lead Plaintiffs would then need to brief the inevitable summary judgment motions, *Daubert* motions, and other pre-trial motions. Trial would be complex and expensive, requiring significant factual and expert testimony to prove the elements

of Lead Plaintiffs' claims. Importantly, even a jury verdict would not guarantee the recovery of damages for the Settlement Class that this $300,000 cash recovery does. *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07 Civ. 61542, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011) (overturning jury verdict in favor of plaintiff class and granting judgment for defendants as a matter of law). Defendants would likely appeal any favorable verdict, and the appellate process could last several years, with no assurance of a favorable outcome for the Settlement Class. Thus, even after additional protracted and expensive efforts, the Settlement Class might obtain a result less than the Settlement recovery, or even nothing at all.

**b) The Reaction of the Settlement Class.**

This factor "requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable." *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08 Civ. 397, 2013 WL 5505744, at *2 (D.N.J. Oct. 1, 2013). It is well-established that the lack of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members. *See In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003) ("unanimous approval of the proposed settlement by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement").

Lead Plaintiffs submit in support of this motion a declaration from Lead Plaintiffs' claims administrator, JND Legal Administration of Seattle, Washington ("JND").[1] As described, over 17,000 Notice packets were disseminated to potential Settlement Class Members. Declaration of Luiggy Segura ("Segura Decl."), ¶5. Having fully complied with the Court's Notice directives (as ordered in the Preliminary Approval Order), and not receiving any objections, exclusions, or

[1] JND was selected to serve as the Claims Administrator by Defendants as they are responsible for paying for the Notice and Administration Expenses. Supp. Apton Decl. at ¶7. JND was only selected after Lead Counsel and Defense Counsel requested proposals from four different claims administrators and had discussions on various terms, including the capping of costs. *Id.* Lead Counsel has no ownership interest in JND and will not receive any payment or fees from JND as a result of them serving as the Claims Administrator. *Id.*

complaints with regard to the Settlement (*id.* at ¶¶9, 10), the Court can infer that Lannett shareholders support approval of the Settlement.

"The Third Circuit Court of Appeals has recognized the practical conclusion that it is generally appropriate to assume that 'silence constitutes tacit consent to the agreement'" in the class settlement context." *Harlan v. Transworld Sys., Inc.*, No. 13-5882, 2015 WL 505400, at *8 (E.D. Pa. Feb. 6, 2015) (citing *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993). "The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption . . . in favor of the Settlement . . ." *Cendant*, 264 F.3d at 235; *see also Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990) (objections by 29 members of a class comprised of 281 "strongly favors settlement"). The fact that there are no objections to the proposed Plan of Allocation provides strong support for the plan, as well. *See Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) (finding that "the favorable reaction of the Class supports approval of the proposed Plan of Allocation").[2]

**c) The Stage of the Proceedings and Amount of Discovery Completed.**

The third *Girsh* factor requires a court to consider "the degree of case development that class counsel have accomplished prior to settlement" in order to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating" the settlement. *Cendant*, 264 F.3d at 235 (citation omitted); *see also Warfarin*, 391 F.3d at 537; *Devlin v. Ferrandino & Son, Inc.*, No. 15-4976, 2016 WL 7178338, at *5 (E.D. Pa. Dec. 9, 2016).

Here, Lead Plaintiffs and Lead Counsel had a sound basis for assessing the strengths and weaknesses of the claims and Defendants' defenses when they entered into the Settlement. Lead Counsel extensively investigated the merits of the case prior to filing the Complaint and reviewed thousands of Lannett emails on behalf of Lead Plaintiffs.

---

[2] If any objections to the Settlement or requests for exclusions are received subsequent to the filing of this brief, Lead Plaintiffs will respond in their reply papers.

As set forth in the Declaration of Adam M. Apton in Support of Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, dated July 12, 2019 (Dkt. No. 69-2) (the "Apton Decl."), Lead Plaintiffs' efforts also included, among others, interviewing former Lannett employees, analyzing Lannett's SEC filings, and reviewing news articles and other publicly available information and statements issued by or concerning Lannett. Apton Decl. ¶3. Lead Plaintiffs and Lead Counsel further obtained information about the strengths of the claims and the defenses asserted by Defendants through briefing of the motion to dismiss. *Id.* at ¶¶7-8. Following the Court granting in part and denying in part Defendants motion to dismiss, Lead Plaintiffs proceeded with both party and non-party discovery on the Surviving Claims. *Id.* at ¶¶8-10. From these discovery, Lead Plaintiffs reviewed over 1,000 pages of internal documents from Lannett and also reviewed stockholder information from the Steinlauf family's broker. *Id.* at ¶11. From the information received, Lead Plaintiffs determined that in all likelihood they would not be successful in establishing liability and overcoming a motion for summary judgment made by Defendants. *Id.* at ¶11. There is no question that Lead Plaintiffs and their counsel were in an excellent position to evaluate the strengths and weaknesses of the claims asserted and defenses raised by Defendants, as well as the substantial risks of continued litigation and the propriety of settlement. *Id.* at ¶¶8-12. Having sufficient information to properly evaluate the case, the Action was settled on terms highly favorable to the Settlement Class in light of the risk, time, and expense of continuing the Litigation. *Id.* at ¶12.

Within the Third Circuit and throughout the country, "a strong public policy exists, which is particularly muscular in class action suits, favoring settlement of disputes, finality of judgments and the termination of litigation." *Ehrheart*, 609 F.3d at 593; *see also In re Gen. Motors Corp. Pick-Up Trucks Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("*GMC Trucks*") ("[t]he law favors settlement"). The Third Circuit has noted that this strong presumption in favor of voluntary settlement agreements "is especially strong 'in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.'" *Ehrheart*, 609 F.3d at 595 (quoting *GMC Trucks*, 55 F.3d at 784). This policy will be well-served by

approval of the Settlement of this complex securities class action that, absent resolution, would consume years of additional time of this Court and likely, years of additional appellate practice.

**d) The Risks of Establishing Liability.**

The fourth *Girsh* factor looks to "the risks of establishing liability." *Girsh*, 521 F.2d at 157. Under this factor, "[b]y evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *GMC Trucks*, 55 F.3d at 814. In considering this factor, the Court has recognized that "[a] trial on the merits always entails considerable risks," *In re Schering-Plough/ Merck Merger Litig.*, No. 09-cv-1099, 2010 WL 1257722, at *10 (D.N.J. Mar. 26, 2010), and "no matter how confident one may of the outcome of the litigation, such confidence is often misplaced." *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 343 (E.D. Pa. 2007). Indeed, "[c]lass action securities litigation cases are notoriously difficult cases to prove." *In re Viropharma Inc. Sec. Litig.*, No. CV 12-2714, 2016 WL 312108, at *11 (E.D. Pa. Jan. 25, 2016); *see also In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (noting that "[l]arge class actions alleging securities fraud" are "inherently complex"). Although Lead Plaintiffs believe that their claims have merit, the risks of establishing liability in this Action were particularly significant and weigh heavily in favor of approval of the Settlement.

To establish their Section 10(b) claim, Lead Plaintiffs must prove that Defendants: (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiffs reasonably relied; and (5) that proximately caused their injuries. *Ikon,* 277 F.3d at 667. Here, Defendants had numerous falsity and scienter arguments that posed significant hurdles to proving that they acted with an intent to commit securities fraud or with severe recklessness. Scienter is commonly regarded to be the most difficult element to prove in a securities fraud case. *See, e.g., ViroPharma*, 2016 WL 312108, at *12 (approving settlement and nothing that "proving scienter is an uncertain and difficult necessity for plaintiffs"); *In re Datatec Sys., Inc. Sec. Litig.*, No. 04-CV-525 (GEB), 2007 WL 4225828, at

*4 (D.N.J. Nov. 28, 2007) (proving scienter in a securities class action is a "formidable task" that supported final approval of the settlement).

As an initial matter, Defendants would note that Lead Plaintiffs face "substantial hurdles" in proving their falsity scienter allegations. Defendants would likely argue at summary judgment, and/or trial, that Defendants had not made a misleading statement concerning the JSP and/or its nominees was in fact a significant Lannett shareholder during the Class Period or that they knew or recklessly disregarded that this was not true

Furthermore, the documentary evidence Lead Plaintiffs received strongly supported the conclusion JSP and/or its nominees was in fact a significant Lannett shareholder during the Class Period. These would have presented significant challenges to establishing and proving falsity and scienter. Thus, there no certainty that the jury would have ultimately credited Lead Plaintiffs' theories of the case and evidence over Defendants' counter-evidence.

**e) The Risks of Establishing Loss Causation and Damages.**

Even if Lead Plaintiffs successfully established liability, they also confronted challenges in establishing loss causation and ultimately proving damages, including arguments that the alleged misstatements had only a minimally inflationary effect on Lannett's stock price during the Class Period. Lead Plaintiffs bear the burden of proving loss causation and damages for their claims under Section 10(b) – that is, they must show that the alleged false statements or omissions caused investors' losses. *See ViroPharma*, 2016 WL 312108, at *12. The Supreme Court's decision in *Dura Pharms., Inc.. v. Broudo*, 544 U.S. 336 (2005), and the subsequent cases interpreting *Dura*, have made proving loss causation even more difficult and uncertain than it was in the past. *See, e.g., In re Ocean Power Techs., Inc.*, No. 14 Civ. 3799, 2016 WL 6778218, at *19 (D.N.J. Nov. 15, 2016) ("proving loss causation would be a major risk faced by Plaintiff").

Here, Lead Plaintiffs' estimated maximum aggregate damages are approximately $120 million for the Class Period of February 8, 2018 through and including August 17, 2018. *See* Supp. Apton Decl. at ¶5. Although Lead Plaintiffs would have been able to present a cogent and persuasive expert's view establishing damages, there is little doubt that Defendants would have

been able to present a well-qualified expert who would opine against Lead Plaintiffs' findings. Given the Court's holding on Defendants' motion to dismiss, it was unclear whether Lead Plaintiffs would have been able to prove the element of loss causation with regard to the Surviving Claims. *See id.* at ¶6. Thus, despite the total aggregate damages of $120 million, only a fraction of that amount (if anything) may have ultimately been recoverable.

"Courts in this district have recognized that competing expert testimony presents significant risks to Lead Plaintiff's success in establishing damages." *Par Pharm.*, 2013 WL 3930091, at *6 (citing *Cendant*, 264 F.3d at 239 ("[E]stablishing damages at trial would lead to a 'battle of experts' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."). Lead Plaintiffs could not be certain which expert's view would be credited by the jury and, accordingly, this "battle of the experts" created an additional level of litigation risk. *See ViroPharma*, 2016 WL 312108, at *13 ("The conflicting damage theories of defendants and plaintiffs would likely have resulted in an expensive battle of the experts and it is impossible to predict how a jury would have responded."); *Schuler v. Medicines Co.*, No. CV 14-1149 (CCC), 2016 WL 3457218, at *7 (D.N.J. June 24, 2016) ("In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.") (quoting *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744–45 (S.D.N.Y. 1985)). In short, Lead Plaintiffs and Lead Counsel recognized the possibility that a jury could be swayed by experts for the Defendants, and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs might have sought at trial.

**f) The Risks of Maintaining Class Action Status Through Trial.**

The risk of obtaining and maintaining class certification through trial also supports approval of the Settlement. Lead Plaintiffs had not yet moved for class certification at the time of the Settlement and, absent the Settlement, there would have been a contested motion for class certification. Although Lead Counsel believe that the requirements for Rule 23 are satisfied in this case and would vigorously argue for class certification, class-certification discovery would have

been conducted and Defendants, without doubt, would have opposed the motion. The process would have added time and expense to the proceedings, and the outcome of such a contested motion was far from certain. Moreover, even if the class was certified for other than settlement purposes, "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321; *see also In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 506–07 (W.D. Pa. 2003) ("[A]s in any class action, there remains some risk of decertification in the event the Propose[d] Settlement is not approved. While this may not be a particularly weighty factor, on balance it somewhat favors approve of the proposed Settlement.").

**g) The Ability of Defendants to Withstand a Greater Judgment.**

This factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Cendant*, 264 F.3d at 240; *Ikon*, 194 F.R.D. at 183 (defendants' inability to pay a greater sum would support approval of settlement). Even the "fact that [defendants] could afford to pay more does not mean that [they are] obligated to pay any more than what the [] class members are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin*, 391 F.3d at 538; *see also Schering-Plough*, 2009 WL 5218066, at *4 ("pushing for more in the face of risks and delay would not be in the interests of the class"). Here, while Defendants arguably could afford to pay more that was not a certain outcome. In fact, given the risks to the Litigation as evidenced by the documentary discovery received by Lead Plaintiffs, there was a real and significant chance that Class Members would receive nothing at all. *See* Supp. Apton Decl. at ¶¶4-6.

**h) The Size of the Settlement Fund in Light of the Range of Possible Recovery and the Risks of Litigation.**

The final two *Girsh* factors, typically considered in tandem, ask "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. "In making this assessment, the Court compares the present value of the damages plaintiffs would likely recover if successful, appropriately discounted

for the risk of not prevailing, with the amount of the proposed settlement." *Par Pharm.*, 2013 WL 3930091, at *7 (citing *GMC Trucks*, 55 F.3d at 806).

The proposed $300,000 Settlement is reasonable in light of the risks of litigation (as discussed above). Here, given the unfavorable information in the discovery documents received by Lead Plaintiffs there was a real and substantial risk that no recovery would be obtained if the Litigation continued. Supp. Apton Decl. at ¶¶4-6. When faced with defenses that posed a risk of "no recovery at all," courts have found that a "settlement represents a fair deal for the class when compared with a risk-adjusted estimate of the value of plaintiffs' claims." *In re Nat'l Football League Players*, 821 F.3d at 44; *see Saunders v. Berks Credit & Collections, Inc.*, No. CIV. 00-3477, 2002 WL 1497374, at *12 (E.D. Pa. July 11, 2002) (finding settlement amount of approximately $5,700 for subclass claims reasonable because they may not recover any damages based on their claims); *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 485 (D.N.J. 2012) (finding settlement reasonable given the "real risk of proving their claims."). "In short, without this settlement, the shareholders might have gained nothing[.]").

When all the *Girsh* factors are considered, the proposed Settlement is fair, reasonable, and adequate and provides a certain outcome in the best interests of the Settlement Class. Co-Lead Counsel, on behalf of Lead Plaintiffs, have weighed the strengths and weaknesses of the relevant claims, defenses, and likelihood of recovery and, after extensive arm's-length negotiations, reached this Settlement. Under these circumstances, Lead Plaintiffs respectfully submit that the Settlement should be finally approved.

#### 4. The *Prudential* Considerations Also Support the Settlement

In addition to the traditional *Girsh* factors, the Third Circuit also advises courts to address considerations set forth in *Prudential*, 148 F.3d at 323, where applicable. With respect to the first consideration, Lead Plaintiffs and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the case gained through an extensive investigation, the drafting of a thorough and detailed amended complaint, motion practice, the review of approximately 1,000

internal emails of Lannett, and consultations with experts and/or consultants in the fields of damages and loss causation,. *See* Section II above.

The remaining additional factors all support approval of the Settlement because Settlement Class Members were afforded the right to opt out of the Settlement (the fourth factor) and, to date, none have chosen to do so; Lead Counsel's request for attorneys' fees is reasonable as set forth in the accompanying Brief in Support of Lead Plaintiffs' Brief In Support Of Lead Plaintiffs' Motion For An Award Of Attorneys' Fees And Reimbursement Of Litigation Expenses (and, in any event, approval of the Settlement is separate from and not dependent on any outcome of the motion for attorneys' fees and reimbursement of litigation expenses); and the Plan of Allocation, which will govern the processing of claims and the allocation of settlement funds (the sixth factor), is fair and reasonable as set forth in Part III.B. below.

**B. The Plan of Allocation Is Fair, Reasonable, and Adequate.**

The "[a]pproval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Merck & Co. Vytorin ERISA Litig.*, No. 08-CV-285, 2010 WL 547613, at *6 (D.N.J. Feb. 9, 2010) (citing *Ikon*, 194 F.R.D. at 184). "In evaluating a plan of allocation, the opinion of qualified counsel is entitled to significant respect. The proposed allocation need not meet standards of scientific precision, and given that qualified counsel endorses the proposed allocation, the allocation need only have a reasonable and rational basis." *Boyd v. Coventry Health Care Inc.*, No. DKC09-2661, 2014 WL 359567 (D. Md. Jan. 31, 2014).

Here, the proposed Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiffs' consulting damages expert, provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Proof of Claim and Release forms. Under the Plan of Allocation, a recognized claim amount will be calculated for each purchase or acquisition of Lannett common stock during the Settlement Class Period (February 8, 2018 through August 17, 2018, inclusive) that is listed in the Proof of Claim and Release form and for which adequate documentation is provided. *See* Stipulation,

Exhibit A-1 at 11-12 (Dkt. No. 68-2); Exhibit A-2 (Dkt. No. 68-3). The calculation of a claimant's recognized claim is based on the number of shares purchased or acquired during the Settlement Class Period and held as of August 17, 2018 multiplied by the $8.15 decline in Lannett's common stock price following the release of negative information about the Company related to the alleged fraud. *See* Exhibit A-1 at 12 (Dkt. No. 68-2). An Authorized Claimant's recognized claim for all of a claimant's purchases of Lannett common stock during the Settlement Class Period and held as of August 17, 2018 and will be used to distribute the Net Settlement Fund to Authorized Claimants on a *pro rata* basis based on the relative size of their claims. *Id.* at 12. *See, e.g.*, *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (deeming plan of allocation "even handed" where "claimants are to be reimbursed on a *pro rata* basis for their recognized losses based largely on when they bought and sold their shares of General Instrument stock"); *Ocean Power*, 2016 WL 6778218, at *23 ("*pro rata* distributions are consistently upheld, and there is no requirement that a plan of allocation 'differentiat[e] within a class based on the strength or weakness of the theories of recovery'") (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 328 (3d Cir. 2011)).

Lead Counsel submit that the Plan of Allocation fairly and rationally allocates the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered as a result of the conduct alleged in the Complaint. Moreover, to date, there have been no objections to the proposed Plan of Allocation. Accordingly, for all of the reasons set forth herein and in the Joint Declaration, the Plan of Allocation is fair and reasonable, and should be approved.[3]

---

[3] In addition, pursuant to Judge Kearney's recommendation at the preliminary approval hearing (*see* Preliminary Approval Hearing Transcript 34:24-38:22), the Parties have agreed to designate the Investor Protection Trust as the recipient of any *de minimis* balance that remains after the settlement payments are made, thereby replacing the Philadelphia Bar Foundation in § 5.10 of the Stipulation. The IPT is a 501(c)(3) non-profit organization headquartered in Washington, D.C. The IPT was founded in 1993 as part of a multi-state settlement to resolve charges of misconduct, and serves to educate investors throughout the United States. A brochure of recent and upcoming IPT events is attached as Exhibit A to the Supp. Apton Decl.

### C. Notice to the Settlement Class Satisfies the Requirements of Rule 23, Due Process, and the PSLRA.

"Modern plaintiff class actions . . . permit[] litigation of a suit involving common questions when there are too many plaintiffs for proper joinder" and may also permit "the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). Classes under Rule 23(b)(3) classes have the right to opt out of the litigation and must be given notice of the pending class action. *See* FED. R. CIV. P. 23(c)(2)(B); FED. R. CIV. P. 23(c)(2)(B)(v)(stating "that the court will exclude from the class any member who requests exclusion"). "[T]o bind an absent plaintiff concerning a claim for money damages or similar relief at law" there must be "minimal procedural due process protection." *Shutts*, 472 U.S. at 811–12 (1985); *see also* FED. R. CIV. P 23(e)(1). The Supreme Court has held that due process, at a minimum, requires the "best practicable" notice, adequate representation, "an opportunity to be heard and participate in the litigation," and an "opportunity to remove [one]self from the class" to be afforded to an absent plaintiff in class action suits. *See Shutts*, 472 U.S. at 8112.

In *Shutts*, the Supreme Court rejected the "contention that the Due Process Clause of the Fourteenth Amendment requires that absent plaintiffs affirmatively 'opt in' to the class, rather than be deemed members of the class if they do not 'opt out.' *Id.* at 812. As such, the Supreme Court noted that the level of consent for due process is the determining factor. *Id.* In rendering its holding, the Supreme Court's noted that requiring an affirmative inclusion "would probably impede the prosecution of those class actions involving an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit." *Id.* at 813. Thus, the Supreme Court held that requisite consent is found, and thereby due process, "where [a] fully descriptive notice is sent first-class mail to each class member, with an explanation of the right to 'opt out[].'" *Id.*

Therefore, the fact that a class action under Rule 23(b)(3) is an opt out class does not mean that due process has been violated by requiring these same class members to file a proof of claim

to participate in the recovery.[4] The preliminary approved Settlement Class is comprised of an ascertainable group of investors who purchased or acquired shares during the Class Period, held them as of August 17, 2018, and were damaged thereby. Dkt. No. 73 at ¶3.a. Here, the identification and ascertainably of a class member stems from the class definition and a class member proving through their trading records their membership in the class. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013)("Ascertainability provides due process by requiring that a defendant be able to test the reliability of the evidence submitted to prove class membership."). In fact, requiring members of an opt out class to file a proof of claim in order to participate in an opt out class, is routinely used in situations, such as here, where the members of an opt out class cannot be accurately identified. *See Philadelphia Elec. Co. v. Anaconda Am. Brass Co.,* 43 F.R.D. 452, 259 (E.D. Pa. 1968) ("I see no reason why those class-members who do not elect exclusion from the class may not be required to take some kind of minimal affirmative action as a condition of ultimate recovery"); *Biben v. Card*, 789 F. Supp. 1001, 1006 (W.D. Mo. 1992) ("In the instant case, the class representatives complied with due process requirements as explained by *Shutts* when they gave … shareholders notice of the class action and an opportunity to opt-out …. Now is the time for the class members to show that they have been damaged by the defendants' actions. Asking class members to submit claims will not impede the prosecution of this action, a *Shutts* concern").

Notice to the Settlement Class of the proposed Settlement satisfied Rule 23's requirement of "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). Here, the due process concerns have been met.[5]

---

[4] *See* Preliminary Approval Hearing Transcript 4:11-18; Preliminary Approval Order n.4.

[5] As discussed throughout, Lead Counsel has adequately represented the Class and will continue to do such until the Court orders that this matter is finally closed.

On August 16, 2019, the Claims Administrator caused the Summary Notice to be published on *PR Newswire* apprising potential Settlement Class Members of the Settlement. Declaration of Luiggy Segura dated August 19, 2019 (ECF No. 74-1) (the "Initial Segura Decl."), ¶7. Copies of the Notice, Proof of Claim and Release, Stipulation, Preliminary Approval Order, the transcript of the Preliminary Approval hearing held on July 30, 2019 (including among other things a discussion of the supplemental agreement), and the Complaint have been posted to the website established for the Action, www.lannettsecuritiessettlement.com. *Id*. at ¶9. The Claims Administrator identified and mailed Notice Packages via first-class mail to as many as potential Settlement Class Members as it could reasonably identify. As of January 2, 2020, the Claims Administrator has mailed a total of 17,159 Notice Packets to potential Settlement Class Members, brokers, and nominee holders. Segura Decl. at ¶5. The Notice advised potential Settlement Class Members of, among other things: (i) their right to exclude themselves from the Settlement Class; (ii) their right to object to any aspect of the Settlement, the Plan of Allocation, or the attorneys' fee and expense request; and (iii) the method for submitting a Proof of Claim and Release in order to be eligible to receive a payment from the proceeds of the Settlement; and (iv) their right to appear at the hearing for the final approval of the Settlement to vocalize their concerns to the Court. *See* Dkt. No. 68-2. Notice programs such as this have been approved in a multitude of class action settlements. *See, e.g.*, *In re Veritas Software Corp. Sec. Litig.*, 396 Fed. Appx. 815, 816 (3d Cir. 2010) (describing notice combining mail to known class members and publication over newswire); *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirements of both Fed. R. Civ. P. 23 and the due process clause.").

To date, 2,534 Proof of Claims and Releases were received. Segura Decl. at ¶11. The response rate to the Notice Package currently stands at approximately 19% which from the Claims Administrator's experience falls within the anticipated range that they have historically seen from

administering other securities class action settlements. *Id*. at ¶11.[6] From the claims processing completed to date, 822 valid Proofs of Claims and Releases have been received which totals over $43 million in recognized claims. These valid Proofs of Claims and Releases equal about 5.5 million damaged shares as determined by the proposed Plan of Allocation. *Id.* at ¶11. This, in turn, equates to approximately 40% of the total damaged shares estimated by Lead Plaintiffs' expert. *See* Supp. Apton Decl. at ¶5.

Of the 822 valid claims processed to date, 422 would be considered *de minimus* for resulting in a payment of less than $10.00, if the Court approves Lead Plaintiff's proposed Plan of Allocation. *Id.* at ¶11. The Third Circuit has found that a *de minimis* threshold of $10 contained in a plan of allocation was acceptable because, in part, it supports key rationale underlying the class action mechanism "to provide sufficient incentive to prosecute an action 'by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor[.]'" *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 (3d Cir. 2011); *see also In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004)(finding a $10 *de minimus* threshold in the plan of allocation as reasonable because it "preserve[s] the settlement fund from excessive and unnecessary expenses in the overall interests of the class as a whole."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484JFK, 2007 WL 4526593, at *12 (S.D.N.Y. Dec. 20, 2007)("courts have approved minimum payouts in class action settlements in order to foster the efficient administration of the settlement"). Thus, if these claims were not excluded, the costs and fees associated with administering the Settlement to include to these claims would cause a significant increase in the Notice and Administration Expenses. *See* Segura Decl. at ¶11 (discussing the added time, issues, and the related costs and expenses in processing claims,

[6] Notably, in the context consumer class actions, the Federal Trade Commission found that notice campaigns that utilize notice packets with claims forms had about a 10% claims rate and that the median calculated claims rate was 9%. *See* Federal Trade Commission, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* (Sept. 2019), https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf

issuing checks, and following up with class members to cash checks of a *de minimus* amount). Thus, given the Settlement Amount, was reached, in part, based on the amount of the estimated Notice and Administration Expenses that Defendants would be obligated to pay (as based on agreement reached with JND for the work to be performed), increasing the expenses to include the additional work for the *de minimus* claims would have likely had the detrimental effect of reducing the Settlement Amount for all Class Members.[7]

**D. Certification of the Settlement Class Remains Warranted**

In presenting the proposed Settlement to the Court for preliminary approval, Lead Plaintiffs requested, for purposes of the Settlement only, that the Court certify the Settlement Class under Rules 23(a) and (b)(3). In Preliminary Approval Order, this Court certified the Settlement Class. *See* Dkt. No. 73 at ¶¶3. Nothing has changed to alter the propriety of the Court's certification, and no Settlement Class Member has objected to class certification. For all the reasons stated in Lead Plaintiffs' Brief In Support of Lead Plaintiffs' Unopposed Motion For Preliminary Approval of Settlement (Dkt. No. 69-1, at 13-16), which is incorporated herein by reference, and in the Court's Preliminary Approval Order, Lead Plaintiffs request that the Court reaffirm its determinations in the Preliminary Approval Order and finally certify the Settlement Class for purposes of carrying out the Settlement pursuant to Fed. R. Civ. P. 23(a) and (b)(3), appoint Lead Plaintiffs Soe Wong and Michael Hoeltzel as Settlement Class Representatives, and appoint Lead Plaintiffs' counsel Levi & Korinsky, LLP as Settlement Class Counsel.

[7] Providing a uniform amount of payment to each class member irrespective of their actual losses as a result of the alleged fraud with more consideration paid to those claimants who demonstrate specific losses would almost undoubtedly result in certain class members receiving more and others receiving less than their *pro rata* portion in violation of 15 U.S.C. §78u-4(a)(2)(A)(vi). Moreover, a distribution plan such as this would likely not be found to be fair, reasonable and adequate to the class as a whole as it fails to "take into account the various disclosures during the Class Period and establishing a [class member's] claim value based on the market's reaction to each new piece of information." *Ocean Power*, 2016 WL 6778218, at *23; *see id.* (noting that plans of allocation that courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable" and noting that *pro rata* distributions "are consistently upheld" as fair, reasonable and adequate).

## IV. CONCLUSION

For all the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (i) grant final approval of the Settlement and Plan of Allocation; and (ii) reaffirm its determination to finally certify the Settlement Class for purposes of carrying out the Settlement.

Dated January 3, 2020

Respectfully submitted,

O'KELLY & ERNST, LLC

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 202191)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Phone (302) 778-4000
Fax (302) 295-2873
rernst@oelegal.com

*Liaison Counsel for Lead Plaintiffs*

-and-

LEVI & KORSINSKY, LLP
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Attorneys for Lead Plaintiffs Soe Wong and Michael Hoeltzel and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 3, 2020.

*/s/ Ryan M. Ernst*
Ryan M. Ernst